EXHIBIT 3

1

2          IN THE UNITED STATES DISTRICT COURT

3                   DISTRICT OF UTAH

4

FRANCISCO RODRIGUEZ,        )
5  INDIVIDUALLY AND ON         )  30(b)(6) Deposition of
   BEHALF OF OTHERS            )  Cascade Collections
6  SIMILARLY SITUATED,         )  through:
                               )
7        Plaintiffs,           )  Tucker Morris
                               )
8  vs.                         )
                               )  Case No.
9  CASCADE COLLECTIONS,        )  2:20-CV-00120-JNP
   LLC,                        )
10                             )
        Defendant.             )

11

12

                   May 19, 2020 * 2:00 p.m.
13

           Location:  Virtual deposition via Zoom
14

15

16

              Reporter:  Diana Kent, RPR, CRR
17        Notary Public in and for the State of Utah

18

19

20

21

22

23

24

25

                                        Page  1

APPEARANCES

FOR THE PLAINTIFF:

    Ryan McBride
    KAZEROUNI LAW GROUP, APC
    Attorney at Law
    2633 East Indian School Road
    Suite 460
    Phoenix, Arizona 85016
    Tel: (800) 400-6808
    Fax: (800) 520-5523
    ryan@kazlg.com

FOR THE DEFENDANT:

    Chad Rasmussen
    ALPINA LEGAL
    Attorney at Law
    2230 North University Parkway
    Suite 7E
    Provo, Utah 84604
    Tel: (801) 747-9529
    Fax: (801) 384-0519
    chad@alpinalegal.com

Page 2

INDEX

TUCKER MORRIS

| | PAGE |
|---|---|
| Examination By Mr. McBride | 4 |
| Examination By Mr. Rasmussen | 55 |
| Further Examination By Mr. McBride | 58 |
| Further Examination By Mr. Rasmussen | 59 |
| Further Examination By Mr. McBride | 60 |
| Further Examination By Mr. Rasmussen | 62 |
| Further Examination By Mr. McBride | 63 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 7 |
| Exhibit 2 | Collection Agreement and Assignment of Accounts | 20 |
| Exhibit 3 | Account Notes for Francisco Rodriguez | 23 |
| Exhibit 4 | April 26, 2019 letter to Francisco Rodriguez from Cascade Collections | 26 |
| Exhibit 5 | Cascade's Answer in Rodriguez v. Cascade | 56 |
| Exhibit 6 | Series of Collection Letters | 38 |
| Exhibit 7 | Defendant's Responses to Plaintiff Rodriguez's Interrogatories, Requests for Admissions, and Request for Production of Documents to Defendant Cascade Collections, LLC | 40 |

Page 3

PROCEEDINGS

    Tucker Morris,

called as a witness, being first duly sworn,

    was examined and testified as follows:

    (EXHIBITS 1-7 WERE PREMARKED.)

    EXAMINATION

BY MR. MCBRIDE:

Q. Can you please state and spell your name for the record.

A. State and spell?

Q. Yes.

A. Tucker Morris, T-U-C-K-E-R, M-O-R-R-I-S.

Q. Mr. Morris, have you ever had your deposition taken before?

A. I have not.

Q. So what I'm going to do is go over some ground rules here to make everything go a little bit more smoothly. These rules are especially important now that we are doing this over Zoom as opposed to in person. You have done a good job so far, but please make sure to give a verbal response as opposed to an uh-huh or huh-uh. Do you understand? Is that okay?

A. Yes, that's fine.

Q. Okay. And then you've also been doing a good job of waiting until I finish my question until you respond, and I will try to do the same thing and then wait for you to finish your response before I ask my next question. Does that work?

A. Yes, that's great. Thank you.

Q. Okay. If you need a break, let me know. This isn't a marathon. I just ask that you answer the pending question and then we will take a break after that. I usually take a break every hour or so anyway. But if you need more frequent breaks, that's fine as well. Okay?

A. Okay.

Q. I'm entitled to your best estimate today but I don't want you to guess. Do you know the difference between an estimate and a guess?

A. Yeah.

Q. If you answer a question today I'm going to assume that you understand. If you don't understand the question, please ask me to rephrase it or tell me you don't know or you don't understand. Otherwise I will assume that you understand. Is that okay?

A. Yes, that's great.

Q. After this deposition, you're going to

1 have an opportunity to review the transcript, which is
2 what the court reporter, Diana, is taking down today.
3 And you'll have a chance to make any changes to the
4 transcript if anything was in error. However, if you
5 make any changes to any substantive responses, I will
6 have an opportunity to comment upon that at a further
7 date. Do you understand that?
8     A.    Could you define a substantive change,
9 please?
10    Q.    Sure.  So in the context of this case if I
11 ask you a question, and this is just an example, "Do
12 you think that your company violated the FDCPA," just a
13 broad question like that and you answer yes and later
14 on you go back and you change it and say, "No, we
15 didn't violate it, there was no violation," that would
16 be substantive to me.  Something like you spelled your
17 name wrong, that would not be substantive.  Does that
18 make sense?
19    A.    Yes.  Understood.  Thanks.
20    Q.    Is there any reason you can't give your
21 best testimony today?  For instance, did you take any
22 drugs or drink any alcohol in the last 24 hours?
23    A.    No, sir.
24    Q.    Okay.  We are going to jump right into
25 using this Exhibit Share function.  And I'm going to
Page 6

1 introduce Exhibit 1.
2        Do you have access to that, Mr. Morris?
3    A.    I do.
4    Q.    Okay.  Great.
5        MR. RASMUSSEN:  And Ryan, just real quick,
6 how do I do it?  I've got to refresh?  Is that what I'm
7 supposed to do, or have you not put it in the folder
8 yet?
9        MR. MCBRIDE:  I haven't.  I'm just doing
10 it right now.
11        (Discussion off the record.)
12    Q.    So Mr. Morris, do you have that amended
13 deposition notice in front of you?
14    A.    Yeah.  I'm looking at it right now.
15    Q.    Do you recognize this document?
16    A.    Yes.  Yes, I do.
17    Q.    And I know I kind of just labeled what it
18 was, but can you tell me what it is, please?
19    A.    Yes.  Let's see.  It's the Plaintiff's
20 Amended Notice of Taking Deposition of Defendant
21 Cascade Collections.
22        MR. RASMUSSEN:  Hold on.  Sorry, Ryan.  I
23 don't think I shared.  I think he is assuming this is
24 the original notice.  It looks like you did amend it
25 after last week, we talked about changing it to 2:00
Page 7

1 p.m.
2        MR. MCBRIDE:  Okay.
3        MR. RASMUSSEN:  So I actually don't think
4 he has seen this one.
5        MR. MCBRIDE:  Okay.
6        MR. RASMUSSEN:  But I'll let you continue
7 on.  Sorry.
8        MR. MCBRIDE:  Sure.
9    Q.    (By Mr. McBride)  I will give you a minute
10 here, Mr. Morris, to review this document.  I'll tell
11 you, just to speed things up a little bit, I did change
12 the time and then I changed or I added a topic at the
13 end regarding net worth.
14        However, since that time the parties have
15 agreed that I will not be or we will not be seeking
16 discovery at this time for that issue, so I'm not even
17 going to be asking you about that.  But we will go over
18 that in a second.  But take a second to review, please,
19 and let me know if you have reviewed, or once you've
20 reviewed.
21    A.    Okay.  One moment.
22        MR. RASMUSSEN:  Ryan, you are saying it is
23 pretty much the same with the exception of the date
24 change?
25        MR. MCBRIDE:  The time change.
Page 8

1        MR. RASMUSSEN:  The time change, or you
2 added --
3        MR. MCBRIDE:  A 22nd item.
4        MR. RASMUSSEN:  -- a 22nd item?
5        MR. MCBRIDE:  Correct.
6        MR. RASMUSSEN:  Just to put on the record,
7 I will object to this.  The rules allow only, I think
8 it's twenty items.  And so now it's at 22.
9    Q.    Did you have a chance to review that,
10 Mr. Morris?
11    A.    I did.
12    Q.    Okay.  And you are here to testify as the
13 designated representative for Cascade, LLC on all but
14 the very last topic; is that correct?
15    A.    Yes.
16    Q.    Are you the most knowledgeable person on
17 all of these topics, minus the last topic?
18    A.    Yes, I would say so.
19    Q.    Is it okay if I refer to Cascade
20 Collections, LLC as "Cascade" today?
21    A.    That's just fine.
22    Q.    Okay.  Let's change gears a little bit
23 here and let's talk about your general background.
24 What is your highest level of education?
25    A.    Associate's degree.
Page 9

3 (Pages 6 - 9)

| | |
|---|---|
| 1    Q.   And where did you get that degree from? | 1   want to know communications between you and your |
| 2    A.   Utah Valley University. | 2   attorney as it's attorney/client privilege. Okay? |
| 3    Q.   Sorry, you said Utah -- | 3      Who is your current employer? |
| 4    A.   Utah Valley University. | 4    A.   Sorry. Could you be more clear on that? |
| 5    Q.   And when did you graduate from Utah Valley | 5    Q.   Sure. Who do you work for? |
| 6   University? | 6    A.   Cascade Collections. |
| 7    A.   That would have been 2015. | 7    Q.   And who owns Cascade Collections? |
| 8    Q.   And did you have any other higher | 8    A.   That is Chad Rasmussen. |
| 9   education after high school besides Utah Valley | 9    Q.   What is your current position there? |
| 10   University? | 10    A.   Office manager. |
| 11    A.   Not yet, no. | 11    Q.   How long have you worked there? |
| 12    Q.   And what year did you graduate from high | 12    A.   I have worked at Cascade since last May. |
| 13   school? | 13   May 2019. |
| 14    A.   Also 2015. | 14    Q.   And was that always your title, office |
| 15    Q.   Okay. So just so I'm clear, you are | 15   manager? |
| 16   saying that you took some -- you took classes, your | 16    A.   For about -- well, for a couple of weeks I |
| 17   associate's degree, while you were in high school and | 17   was training under the then-office manager. But after |
| 18   graduated the same year in high school as you did with | 18   they left the company, I took on the position of office |
| 19   your associate's degree? | 19   manager. |
| 20    A.   Yes, sir. My high school had some kind of | 20    Q.   And did your position have a name in those |
| 21   agreement with UVU where -- yes, where seniors could | 21   first couple of weeks? |
| 22   graduate both with their high school diploma and their | 22    A.   I'm not sure. No, I don't believe so. |
| 23   associate's degree. | 23    Q.   And who was that prior office manager? |
| 24    Q.   Okay. Understood. Have you received any | 24    A.   That was Diana Tartaglia. |
| 25   other degrees outside of the associate's degree? | 25    Q.   And so Diana trained you for the position |
| <div align="right">Page 10</div> | <div align="right">Page 12</div> |
| 1    A.   No, sir. | 1   of office manager at Cascade? |
| 2    Q.   Have you received any other certifications | 2    A.   Yes. |
| 3   or trainings outside of the associate's degree? | 3    Q.   And can you please describe your duties as |
| 4    A.   No, sir. | 4   office manager? |
| 5    Q.   What documents did you review in | 5    A.   Sure. I mean, broadly managing the |
| 6   preparation for this deposition? | 6   accounts that have been assigned by our clients to |
| 7    A.   For this deposition, let me see. So, the | 7   collections. Importing the accounts. Making contact |
| 8   signed contract for the plaintiff, as well as the | 8   with account debtors and, yeah, assisting them making |
| 9   collections agreement that we have with the original | 9   payment arrangements. |
| 10   creditor in this case; various pdfs of letters sent for | 10    Q.   Okay. And kind of going off of that, can |
| 11   that; the procedure for account import, which includes | 11   you describe the general nature of Cascade's business? |
| 12   the creation of the letters in question. And I believe | 12    A.   What do you mean by that? |
| 13   that's about it. I could refer to our responses as | 13    Q.   What does Cascade do? |
| 14   they are all included, if you'd like. | 14    A.   It's a collections agency. |
| 15    Q.   Sure. And we will go over some of them. | 15    Q.   How many employees are there at Cascade? |
| 16   I just wanted to make sure or I just wanted to know | 16    A.   Just one. |
| 17   what you had reviewed, you know, off the top of your | 17    Q.   How many locations are there? |
| 18   head. And we will go over some more that will refresh | 18    A.   Just the one in Provo. |
| 19   your memory, as well, a little bit later. | 19    Q.   And you said that Cascade was a debt |
| 20    A.   Okay. Excellent. | 20   collection agency. So is the primary purpose of their |
| 21    Q.   Have you discussed this case with anyone | 21   business to collect debts? |
| 22   else besides your attorney? | 22    A.   Yes, sir. |
| 23    A.   No. | 23    Q.   Is there anything else that Cascade does |
| 24    Q.   And just as kind of a general rule here, | 24   besides collect debts? |
| 25   in any of my questions that I'm asking you, I don't | 25    A.   No, sir. |
| <div align="right">Page 11</div> | <div align="right">Page 13</div> |

1    Q.   And what is the percentage, you know,
2  approximately estimate if you can, of consumer debt
3  that Cascade collects?  And that's as opposed to
4  business debt.
5    A.   It's hard to -- I think it's hard to say.
6  We have a couple of clients who, for example, have
7  medical debt accounts that they send us.  So those
8  would obviously be consumer debts.  But I'm not sure I
9  could speak to the total percentage of that without, I
10 guess, going back and reviewing.
11   Q.   And would you say that there's more --
12 that Cascade collects more consumer debt or more
13 business debt?
14   A.   I would probably say more consumer debt
15 than commercial debt.
16   Q.   And would you consider a purchase of a
17 vehicle a consumer debt?
18       Let me rephrase the question.
19       MR. RASMUSSEN:  Objection.  Calls for
20 speculation.
21   Q.   Actually, before you even answer, let me
22 rephrase my question.
23       Would you consider a loan for an auto
24 purchase a consumer debt?
25       MR. RASMUSSEN:  I'm going to object.

1  testified to any of that.
2    Q.   You can answer if you know.
3    A.   Could you repeat the question, please?
4    Q.   Sure.  And let me make it a little more
5  simple.  Does Cascade buy debt from Astor Brothers &
6  Company?
7    A.   No.
8    Q.   Does Cascade make any calls to Astor
9  Brothers & Company's customers?
10   A.   Can you clarify what you mean by
11 "customers," please?
12   Q.   Sure.  When you get assigned a particular
13 portfolio from Astor Brothers & Company, I assume that
14 there's, based on the discovery responses, there are
15 particular people that owe debt or allegedly owe debt
16 to Astor Brothers & Company.  Does Cascade call those
17 people?
18   A.   Yes.
19   Q.   And what do they call them for?
20   A.   To try to make contact with the account
21 debtors to try to make payment arrangements and thus
22 pay off the debt.
23   Q.   Can you please describe the process in
24 which Astor Brothers & Company assigns accounts to
25 Cascade for collection?

1  That's vague and ambiguous.
2    Q.   You can answer if you know.
3    A.   I think it could potentially be, but I
4  would also say it depends on -- I would say you could
5  argue it depends on what the vehicle is used for,
6  whether or not it's a commercial or consumer product.
7    Q.   Okay.  Fair enough.  So you're saying that
8  if the vehicle is used for personal use, then it would
9  be a consumer debt; is that correct?
10   A.   Yes.
11   Q.   And can you describe the relationship
12 between Cascade and Astor Brothers & Company?
13   A.   Yeah.  Per our collections agreement, we
14 are independent contractors.
15   Q.   And what is Cascade independently
16 contracted to do?
17   A.   To collect debts on behalf of, in this
18 case, Astor Brothers.
19   Q.   Okay.  So I just want to make sure that
20 I'm understanding.  So you're saying that Cascade is
21 assigned the debt to collect, but Cascade doesn't
22 actually buy the debt from Astor Brothers & Company.
23 Correct?
24       MR. RASMUSSEN:  Objection.
25 Mischaracterizes Tucker's testimony.  I don't think he

1    A.   Yes.  So, they fill out a spreadsheet that
2  we provide them with information about each account
3  they would like us to collect on.  Once they have
4  filled out that information, they return the
5  spreadsheet to us.  We review the information we have,
6  import it into our system, and -- I'm sorry.  What was
7  the full question again just so I can know when to
8  stop?
9        MR. MCBRIDE:  Diana, can you repeat the
10 question, please?
11       (The record was read as follows:
12       Question: "Can you please describe the
13       process in which Astor Brothers & Company
14       assigns accounts to Cascade for collection?")
15   A.   Oh, I see.  Thank you, Diana.
16       Yeah, so as far as their assigning
17 accounts to us, they take the account that they have
18 written off and they fill out the spreadsheet and they
19 send it to us.
20   Q.   (By Mr. McBride)  Okay.  And how is this
21 process initiated?  Do you reach out to them?  Do they
22 reach out to Cascade?
23   A.   So, our creditors will reach out to us
24 when they have accounts they would like us to collect
25 on.

Q. Okay. And you mentioned that Cascade will import the information on the spreadsheet into its system. How does that work?

A. Let's see. The actual mechanics of how I guess the import goes from the spreadsheet into the system, that's just because it's computer stuff. But we check the spreadsheet for formatting to make sure that it's in a format that our software likes, and then it's just an automated process once the spreadsheet is formatted correctly. We go in and just ask the system to do it.

Q. And are you, Mr. Morris, the person who goes and puts it into the -- inputs it into your system?

A. Yes, sir.

Q. How often does Astor Brothers & Company provide a list of people from which to collect?

A. Fairly rarely. We, if -- not very frequently. Maybe -- I'm sorry. Come to think of it, they sent us one big batch and I'm not sure if they have, off the top of my head, sent us any since. I'd be happy to look, though, if you'd like.

Q. And how many consumers were included in that one big batch?

A. There were about 160 accounts in that one.

Q. And when was that sent to Cascade?

A. That would have been, let's see, it was before I started there. I believe it was early 2018. But again, I could verify that if you'd like.

Q. And so in your responses you're excluding the portfolio that was included in your discovery responses in this case, correct?

A. Oh, I'm not sure.

Q. I'm going to introduce a second exhibit here. Maybe we can clear this up.

A. Okay.

Q. It should have been introduced if you can go ahead and either refresh or go back into the exhibits and let me know once you can see. It's the Collection Agreement and Assignment of Accounts.

A. Okay. Yes, I can see that.

Q. This particular collection agreement, is this referring to the 160 accounts that you were just talking about?

A. Among -- yes, among -- yes, it is.

Q. Okay.

MR. RASMUSSEN: Now, Ryan, I just want to make sure you have the collection agreement with a spreadsheet of accounts. Is that what you're wanting, or are you wanting just a collection agreement?

MR. MCBRIDE: So, I've marked the exhibit as including both of those.

MR. RASMUSSEN: Okay.

Q. (By Mr. Rassmussen) So yeah. And just to make the record clear, it appears there -- I wasn't sure if there were -- let me ask you this, actually, Mr. Morris.

Is there more than one document in Exhibit 2?

A. Yes. Yeah. So -- yes. So there's the Collection Agreement and then there's the partially redacted spreadsheet of accounts.

Q. Okay. Where did this spreadsheet of accounts come from?

A. It came from Astor Brothers. Like I said, they fill out the information, and they sent it to us.

Q. Okay. So this is the spreadsheet that Astor Brothers & Company fills out, correct?

A. Correct.

Q. Okay. And these accounts are all, as you said before, written off. Does that mean that they are all overdue at the time they are sent to Cascade?

A. Yes.

Q. Okay. Once everything is input into the Cascade system, what happens next?

A. After they are imported, then the first step is to generate, review, and send out a dunning letter to the account debtor.

Q. Okay. Just so we are on the same page here, by a dunning letter you mean a collection letter?

A. Yes.

Q. Okay. And how does that process work?

A. There is a function on our system where we are able to generate and download documents from premade templates. Well, I say "premade." Templates I guess premade by us, by Cascade.

Q. Okay. And once those premade templates are created -- I'm assuming are those created on a computer?

A. Yes, sir.

Q. Okay. And once they are created on a computer, what's the next step?

A. As I said, they are reviewed for accuracy and printed out and mailed to the account debtor.

Q. Are they all printed out at Cascade?

A. Yes.

Q. And is the office manager the one that takes care of printing and mailing these letters?

A. Yes.

Q. In regards to the Astor Brothers & Company

1 portfolio, were letters sent out to each and every one
2 of the people that were listed on the spreadsheet that
3 they provided?
4    A.   Yes.
5    Q.   And was anything done differently as to
6 any of those people that were sent that collection
7 letter?
8        MR. RASMUSSEN:  Object.  That's kind of a
9 vague and ambiguous question.
10   Q.   You can answer.
11   A.   Yeah, I think it's a little bit vague, as
12 well.
13   Q.   Okay.  And just to be clear, opposing
14 counsel is going to make objections to reserve his
15 right to bring that up in the future.  But unless it's
16 asserting an attorney/client privileged question, I'm
17 going to ask you to answer, just so we are on the same
18 page.  I'm happy to try to clarify that question and
19 make it a better question.
20       So you sent all these letters out to --
21 Cascade sent all these letters out to the people listed
22 in the spreadsheet for Astor Brothers & Company.  Was
23 there -- did you do anything -- did Cascade do anything
24 differently in regards to putting together the whole
25 process that we just talked about; so inputting that
Page 22

1    A.   Yes.  It looks to be account notes for the
2 plaintiff.
3    Q.   Did you review this before the deposition?
4    A.   I did.
5    Q.   Are these all of the account notes for the
6 plaintiff, Francisco Rodriguez?
7    A.   Yes.
8    Q.   Okay.  So can you -- I can ask you
9 questions one by one, but if you could just walk me
10 through what you did on his account, that would be
11 helpful.
12   A.   Okay.  Let me take a look.  You'll see
13 that the first two, four, six or so notes are for
14 actions taken by Diana, who was the then-manager.
15 Let's see.  So generally an envelope with the address
16 for the account debtor is the first three.  It looks
17 like there's maybe an error or something there.  And
18 then following that it says, "Document Generated:
19 FDCPA: Dunning Prelit," which is the collections
20 letter.
21       And then let's see.  The next one up was
22 just a change in account status marking it for our
23 reference, by Chad Rasmussen marking that the account
24 or rather the account debtor had filed bankruptcy.  And
25 finally, just a note from myself notating that the
Page 24

1 information into the system, formulating a collection
2 letter, and then printing out and mailing the
3 collection letter?  Was anything done differently in
4 regards to, for instance, like a subset of people, like
5 ten people?  That's kind of what I'm getting at, and I
6 can ask that again if you'd like.
7    A.   Okay.  I think I understand.
8        No.  With the exception of I guess letters
9 being sent to different people with different amounts
10 owing at different addresses and stuff, no exceptions.
11   Q.   Okay.  So the contact information and
12 amount due obviously would be different for each
13 person.  But other than that, it was kind of the same
14 process that you went through, right?
15   A.   Right.
16   Q.   Okay.  I'm going to introduce an exhibit
17 so just give me one second here.  It's loading.
18       MR. RASMUSSEN:  This is another exhibit,
19 Ryan, you're doing?
20       MR. MCBRIDE:  Correct.  So it should have
21 been introduced, this is going to be Exhibit 3.
22   Q.   (By Mr. McBride)  Mr. Morris, please let
23 me know when you're there.
24   A.   I can see it.
25   Q.   Okay.  Do you recognize this document?
Page 23

1 bankruptcy had been dismissed.
2    Q.   Okay.  Thank you.  Just a couple of
3 clarifying questions here.  So you think that the
4 reason there were three entries regarding generating an
5 envelope was probably an error; is that correct?
6    A.   Yes.  That would be my belief, yes.
7 Because -- let's see.  Because it looks like the second
8 and third ones were generated three minutes apart.
9    Q.   Okay.  And what about the dunning letter;
10 it looks like those time periods are pretty far apart,
11 from what I can tell.  It looks like it happened on
12 three different dates.  Are those three different
13 letters sent on three consecutive days or was that also
14 an error, you think?
15   A.   As I said before, I'm not sure because it
16 was Diana Tartaglia who documented those.  It would be
17 done for review and direction if she noticed a mistake.
18 Yeah.
19   Q.   Okay.  And the collection that happened in
20 these account notes, that was on behalf of Astor
21 Brothers & Company; is that correct?
22   A.   That's correct.
23   Q.   And do you know what the original debt was
24 for with Astor Brothers & Company?
25   A.   I know it was for a car loan.  I could
Page 25

Page 26:

1 find exactly, I guess, the vehicle in question. But I
2 don't know off the top of my head.
3 Q. Okay. And so based on our previous
4 conversation about, you know, consumer debt with auto
5 purchases, you think that if Mr. Rodriguez used this
6 vehicle for personal use then it would be a consumer
7 debt; is that correct?
8 A. Yes.
9 Q. Besides what's in these account notes, did
10 Cascade take any other collections actions against
11 Mr. Rodriguez?
12 A. No.
13 Q. And can you tell from these account notes
14 if the letter was actually sent to Mr. Rodriguez, the
15 plaintiff?
16 A. I mean, based on my normal work I would
17 say, yes, I can confirm this letter was sent.
18 Q. Okay. I'm going to introduce Exhibit 4,
19 please. Let me know when it's in front of you,
20 Mr. Morris.
21 A. I can see it.
22 Q. Great. Do you recognize this document?
23 A. I do.
24 Q. What is it?
25 A. This is the collections letter that we

Page 27:

1 sent to the plaintiff, Francisco Rodriguez.
2 Q. And is this the letter that is referred to
3 in the previous exhibit that we just looked at with the
4 account notes for Mr. Rodriguez?
5 A. I'll check. Yes.
6 Q. And it's dated April 26, 2019, correct?
7 A. Yes, sir.
8 Q. And to the best of your knowledge is this
9 a true and accurate copy of the collection letter that
10 was sent to Mr. Rodriguez dated April 26, 2019?
11 A. From what I can tell, yes.
12 Q. And based on the account notes, when was
13 this document created?
14 A. Just give me one sec while I take a look.
15 Q. No problem.
16 A. Let's see. It would have been the -- I'm
17 sorry. Document generated on April 26th.
18 Q. And that's 2019?
19 A. Yes, sir.
20 Q. And who created this document?
21 A. It would have been Diana Tartaglia that
22 generated it.
23 Q. And were you -- forgive me, I forget the
24 date you started working. Were you working for Cascade
25 at this point on April 26, 2019?

Page 28:

1 A. Not just yet. I started in May of that
2 year.
3 Q. And creating this document was a regular
4 part of Cascade's business, correct?
5 A. Yes. Correct.
6 Q. Would you agree that this letter is a
7 communication between Cascade and Mr. Rodriguez?
8 A. Yes, I would agree it's a communication.
9 Q. Would you agree that this letter is an
10 attempt to collect $19,138.39 from Mr. Rodriguez?
11 A. Yes, I would.
12 Q. Would you agree that Cascade wanted
13 Mr. Rodriguez to pay the amount due upon receipt of the
14 letter?
15 A. Yes. Or at his earliest convenience.
16 Q. And I know this may seem a little
17 repetitive to you and I apologize, but the purpose of
18 the letter was to prompt a payment, correct?
19 A. Yes.
20 Q. Okay.
21 A. Sorry, as well as to notify him of our
22 attempts to collect the debt.
23 Q. Okay. Thank you.
24 What's the name of the software system
25 that you use when you input the debtor's information

Page 29:

1 into your system?
2 A. It's Simplicity Collect. Simplicity
3 Collect.
4 Q. And Simplicity is the company that creates
5 the premade templates for you; is that correct?
6 A. No, sir. We create our own templates that
7 Simplicity stores for our use.
8 Q. Okay. Simplicity, though -- once you've
9 created those templates, Simplicity helps you generate
10 letters using those templates; is that right?
11 A. Yes. In various formats, is mostly the
12 reason why.
13 Q. I'm going to introduce Exhibit 5. Please
14 let me know when you can see it.
15 A. Okay. I can see it.
16 Q. Okay. First, do you recognize this
17 document?
18 A. Yes. It is our, Cascade Collection's,
19 Answer.
20 Q. And it's Cascade's Answer to plaintiff's
21 complaint in this case.
22 And actually, hold on. Yes.
23 So that's my question, just to kind of
24 clarify. It's Cascade's Answer to plaintiff's
25 Complaint in this case, correct?

1    A.  Yes, sir. Sorry. I was just reading the
2 title of the document.
3    Q.  No problem. Let's go to page 5 of this
4 document.
5    A.  Okay.
6    Q.  And let's look at the second defense. It
7 says that -- well, I can let you read it. Essentially
8 my question, and I'll let you read through it and give
9 you a second, but my question is going to be what facts
10 do you have to support that defense?
11    A.  In this case a plaintiff had a debt that
12 we were collecting; and because he owed money, any
13 damages or amount that we could be made to pay can be
14 set off.
15    Q.  Okay. Let's go to the second defense
16 which I believe is on the next page. Page 6. I'll
17 give you a second to read through that. Let me know
18 when you finish.
19    A.  Okay.
20    Q.  Okay. This is what the -- what we refer
21 to as a bona fide error defense. So my question is
22 what error occurred in sending out these letters, the
23 letter to Mr. Rodriguez?
24    A.  Allegedly the error pertained to language
25 used in the second paragraph of the collections letter

1 in the part that states that if an account debtor wants
2 to verify the debt or dispute the debt that they need
3 to contact us to do so. And the alleged error was the
4 language used in defining how they could do so.
5    Q.  Okay. And I notice you are using the word
6 "alleged." Are you saying that Cascade's position is
7 that they did not commit an error?
8    A.  Yes, sir. Or rather we did not commit a
9 violation of the FDCPA.
10    Q.  Okay. So, I get that. You're saying you
11 didn't commit a violation of the FDCPA. So what is
12 Cascade's position as far as an error? Was there an
13 error committed or was there not an error committed?
14       MR. RASMUSSEN: I'm going to object. It's
15 kind of argumentative.
16    Q.  You can answer.
17    A.  Could you repeat the question, please, so
18 I can have it again?
19    Q.  Sure. In regards to the allegation in
20 Mr. Rodriguez's complaint, was there an error committed
21 by Cascade?
22    A.  I don't -- I don't believe so. I believe
23 it was the semantics of the sentence rather than an
24 actual substance of the sentence that led to
25 Mr. Rodriguez's complaint.

1    Q.  Okay. So I guess for the sake of
2 following up on this, if there was an alleged error,
3 what policies did Cascade have in place to avoid this
4 error?
5    A.  We retain an attorney who proofreads any
6 templates that we have and makes sure that -- I'm
7 trying to think of the word. Make sure that they
8 conform to the law.
9    Q.  And that attorney is Mr. Rasmussen?
10    A.  That's correct.
11    Q.  Are there any other policies that Cascade
12 employed to avoid this alleged error?
13    A.  Yes. As part of an import policy, we do
14 check the letters before we send them out, to make sure
15 everything looks okay, to make sure they all look
16 compliant.
17    Q.  Who checks the letters?
18    A.  I do.
19    Q.  And what are your procedures in place to
20 follow that policy? For instance, do you -- each
21 batch, do you sit down and do it? Or do you do it
22 every week? What specific procedures do you have in
23 place to follow that policy?
24    A.  Okay. I mean, it's -- sorry. Trying to
25 figure out how to say it. It's -- whenever we have a

1 batch of accounts that we have received, just part of
2 the process of sending out the collection letters, as I
3 mentioned, is checking and making sure that the
4 information, you know, contact information, debt
5 information, matches what we have in our system. And
6 just making sure that we are sending the right document
7 to the right person with the right information on it.
8    Q.  Okay. So you check to see if the right
9 document is being sent off to the right person with the
10 right information, as you just testified. But how does
11 that help correct the alleged error that happened here
12 with the alleged language that violates the FDCPA?
13    A.  Oh, I see. I'm sorry. I misunderstood
14 your question.
15       So as far as that goes, like I said, our
16 attorney keeps abreast of any changes to the law, or
17 required language, or anything like that, and
18 periodically makes changes that he thinks prudent and
19 then allows us to review it and make sure that we also
20 agree with the changes that are made. And there's been
21 a variety of changes made to our documents throughout
22 the years.
23    Q.  Okay. So besides that policy, are there
24 any other policies that Cascade had that would avoid
25 this alleged error?

1    A.   Besides editing the templates before they
2  are made, as I said, and then checking them after they
3  are made, as I also said, no.
4    Q.   In regards to editing the templates, are
5  you editing it for -- again, are you still talking
6  about changing the contact information, the right
7  information, but we're not talking about the language
8  that was alleged in the complaint, correct?
9    A.   So specifically for the language in the
10 request, that would be something that Chad Rasmussen
11 would take care of, like I said.  Looking at that
12 information, making sure that it is compliant with the
13 law, and then sending it over and running it by us so
14 that we can make sure that it is, also.  So that's done
15 before any individual documents are made.
16   Q.   Okay.  When was the last time before April
17 26, 2019 that Mr. Rasmussen reviewed the collection
18 letters?
19   A.   Let me see.  It would have been -- let me
20 see.  I believe January 2018, but I could double check
21 that.
22   Q.   Okay.  And that's a pretty specific month
23 about a year and a half earlier, more than two years
24 before now.  So how did you come up with that
25 particular time period?

1    A.   I reviewed the letters and I found the
2  first one that -- I should say I reviewed the first one
3  that I guess has the then-current template that we were
4  using up until the date mentioned.
5    Q.   Okay.  Does Cascade have particular
6  procedures in place for when Mr. Rasmussen reviews the
7  collection letters for accuracy?
8    A.   Could you clarify your question?  What do
9  you mean by that?
10   Q.   Sure.  And I think the end of the question
11 got a little confusing there.
12        Does Cascade have a procedure for how
13 often Mr. Rasmussen reviews the collection letters?
14   A.   No.  We trust Mr. Rasmussen's prudence on
15 updating them in accordance with the law.
16   Q.   And not only does Cascade trust
17 Mr. Rasmussen, but they rely solely on Mr. Rasmussen to
18 make sure that the letters comply with the law,
19 correct?
20   A.   As I said, we do review them to make sure
21 that they comply with the law before we use them.
22 Mr. Rasmussen does update them, but then we look them
23 over to make sure that we agree with his changes.
24   Q.   Okay.  And by "we," you mean the current
25 office manager?

1    A.   Yeah.  The royal we, Cascade.
2    Q.   Does Cascade or the current office
3  manager, will they review the collection letters to
4  make sure they comply with the law without
5  Mr. Rasmussen first reviewing it?
6    A.   I guess I'm a little confused.  As opposed
7  to what?
8    Q.   Sure.  So you just testified that not only
9  will Mr. Rasmussen review the collection letter
10 templates, but then he will send it to the office
11 manager, or Cascade in general.  Will Cascade or the
12 office manager, will they just review it independently
13 at some point without Mr. Rasmussen's direction, or do
14 they always wait for Mr. Rasmussen to prompt Cascade to
15 review the collection letter?
16   A.   I mean, we wait until he is done making
17 changes because then we have changes to look at and
18 see.  I'm not sure I understand your question.
19   Q.   So Cascade won't independently review a
20 collection letter to see if it complies with the law?
21   A.   Not before Mr. Rasmussen has made changes.
22 Because, you know, to -- like I was saying, to keep in
23 compliance with the law.
24   Q.   Sure.  I think we are getting --
25   A.   I think we are circling each other.

1    Q.   Yeah.  I think we are trying to get at the
2  same thing.  And I think we are just not -- yeah.
3        So let me just kind of close that out with
4  Cascade won't proactively go and review a collection
5  letter for compliance with the law.  They will wait for
6  Mr. Rasmussen to direct them to do so; is that correct?
7    A.   Yes.
8    Q.   Okay.  I think now is a good time to take
9  our first break, and hopefully our only break.  We are
10 going to move topics and let's take a five-minute
11 break.  Okay?
12   A.   Okay.
13        (Break taken from 2:58 to 3:04 p.m.)
14   Q.   (By Mr. McBride)  So let's take a look at
15 Exhibit 4, please.  Let me know when you're there.
16        MR. RASMUSSEN:  We're there.
17   Q.   Okay.  In regards to the language that was
18 referenced in the Complaint in the second paragraph of
19 this letter, what did Cascade rely on in using this
20 language?
21   A.   I don't understand your question.
22   Q.   Sure.  Where did this language originate
23 from?
24   A.   The specific language was from
25 Mr. Rasmussen, but the general language is from the

1 FDCPA regarding debt disputes.
2    Q.  Okay.  And do you know what Mr. Rasmussen
3 relied on in believing that this language complied with
4 the law?
5    A.  I don't personally know what
6 Mr. Rasmussen -- what his thought process was, no.
7    Q.  Okay.  Who would know?
8    A.  Mr. Rasmussen.
9    Q.  I'm going to introduce - give me one
10 second here - introduce Exhibit 6 and it should be
11 popping up in a second here.  So please let me know
12 when you have it in front of you.
13       MR. RASMUSSEN:  Is it a big file?
14       MR. MCBRIDE:  Yes.  It should have just --
15       MR. RASMUSSEN:  Four mgs, that's why.
16       THE WITNESS:  Okay.
17    Q.  (By Mr. McBride)  So these are -- there's
18 a lot more than one document, but do you recognize what
19 these documents are?
20    A.  Yes.  These are more collection letters.
21    Q.  And can you tell me specifically,
22 you know, are these collection letters as part of a
23 certain portfolio?
24    A.  Let me see.  It looks like these are from
25 various creditors, so not one particular portfolio, no.

1    Q.  Have you seen all of these -- have you
2 reviewed all of these documents before your deposition?
3    A.  Yes.
4    Q.  In this exhibit?
5    A.  Yes.
6    Q.  Do all of these letters contain the same
7 language complained of in Mr. Rodriguez's complaint?
8    A.  Yes.
9    Q.  Okay.  I'm going to introduce Exhibit 7,
10 and it should be there now.  Please let me know when
11 you're there.
12    A.  We are there.
13    Q.  Okay.  Do you recognize this document?
14    A.  Yes.  These are our responses to the
15 Plaintiff's Interrogatories, Request for Admissions,
16 and Request for Production of Documents.
17    Q.  Did you help in preparing these responses?
18    A.  I did.
19    Q.  And on page 28, and I'll give you a second
20 to get there, but once you get there is that your
21 signature on page 28?
22    A.  Yes, sir.
23    Q.  Okay.  And are these responses to
24 Plaintiff's Discovery Requests true and accurate to the
25 best of your knowledge?

1    Q.  Do you know what time period these letters
2 cover?
3    A.  Let me take a look.  They look like -- let
4 me take a look.  I believe that these --
5       MR. RASMUSSEN:  I don't want to be
6 difficult, but it's a little vague.  What's the
7 question?  I mean, there's dates on every letter.
8       MR. MCBRIDE:  I'd like him to answer the
9 question, if he can.  It sounds like he was going to.
10    A.  Yeah.  It looks like they are the letters
11 that span the year from when, I guess, the letter to
12 Mr. Francisco was sent.  But I would have to verify it
13 again throughout the letters.
14    Q.  And just to clarify I guess, you said that
15 these collection letters are from or regarding
16 different original creditors.  Do you know that for
17 certain, or is that just something that you believe at
18 this point?
19    A.  I know that for certain.  These are
20 different creditors.
21    Q.  And how do you know that?
22    A.  Based on the account number given on the
23 letters.  Each account number, the middle portion of
24 them relates to which creditor they're from, and
25 different middle parts are from different creditors.

1    A.  Yes.
2    Q.  Between February 21, 2019 and February 21,
3 2020 do you know approximately how many letters were
4 sent that used the similar language that was referred
5 to in the complaint of Mr. Rodriguez?
6    A.  Let me see.  I know the figure is in the
7 Responses.  Off the top of my head I believe it's
8 260-something.  But if you'd like, I could refer to the
9 text.
10    Q.  Yeah.  Go ahead and refer to the text, if
11 you need.  That's fine.
12       MR. RASMUSSEN:  Ryan could you repeat the
13 question please?
14       MR. MCBRIDE:  Diana, can you repeat the
15 question, please?
16       (The record was read as follows:
17       Question: "Between February 21, 2019 and
18       February 21, 2020 do you know approximately how
19       many letters were sent that used the similar
20       language that was referred to in the complaint
21       of Mr. Rodriguez?")
22    A.  Yeah, that number was 262.
23    Q.  (By Mr. McBride)  Okay.  Was that -- were
24 those all from the same original creditor, or were they
25 regarding several different original creditors?

1    A.   That was regarding several different
2 original creditors.
3    Q.   Which original creditors were included in
4 those responses?
5    A.   Let me see.  That would have been --
6        MR. RASMUSSEN:  I'm going to object to
7 that.  That's confidential information and I don't
8 think you're entitled to that discovery.
9        MR. MCBRIDE:  How is that confidential?
10       MR. RASMUSSEN:  It's proprietary and
11 confidential.
12       MR. MCBRIDE:  What's proprietary?
13       MR. RASMUSSEN:  Business relationships.
14       MR. MCBRIDE:  Well, the fact that you have
15 a business relationship with a company isn't
16 confidential.  I'm not asking, like, particular details
17 about your relationship with them.
18       MR. RASMUSSEN:  But you are trying to
19 identify their identity.
20       MR. MCBRIDE:  You think their identity is
21 confidential?
22       MR. RASMUSSEN:  Yeah.
23       MR. MCBRIDE:  Really?  Okay.  Are you
24 instructing your client not to answer?
25       MR. RASMUSSEN:  I guess he can answer if

1 he knows.
2        THE WITNESS:  I don't know them all off
3 the top of my head.
4        MR. RASMUSSEN:  And I guess I'll also
5 object to lack of foundation.  This was not part of the
6 topic in your deposition notice.
7    Q.   (By Mr. McBride) Mr. Morris?  Sorry, I
8 didn't hear your answer.
9    A.   Oh, I said I didn't know off the top of my
10 head, and then Chad said something.
11   Q.   Okay.  You don't know any of the other
12 creditors?
13   A.   I said I don't know them all off the top
14 of my head.
15   Q.   Okay.  Can you name the ones that you do
16 know?
17   A.   Yes.  So in addition to Astor Brothers,
18 there was Dean W. Maintenance, Cutting Edge Drywall,
19 Utah Urology, LLC, Imagewear, I believe, and Titan
20 Athletics are the ones I remember.
21   Q.   How many of the 262 letters that were sent
22 were regarding Astor Brothers & Company accounts?
23   A.   I believe that figure is 188.
24   Q.   And before, we talked about there was like
25 one large account with Astor Brothers where -- you

1 know, one batch, I believe you referred to it as.  Was
2 this batch of letters sent all in one time period?  And
3 if so, what was the time period?
4    A.   Let's see.  From the big batch that would
5 have been sent all in one, all together because they
6 came as one spreadsheet, although the time frame for
7 that I don't know off the top of my head but I could
8 find it out.
9    Q.   Okay.  But would it be safe to say it was
10 within or around the time period of the April 26, 2019
11 letter that was sent to Mr. Rodriguez?
12   A.   I'm not sure.  I'd have to verify that.
13 Like I said, I'm not sure off the top of my head.
14   Q.   Okay.  And you said there were 188 letters
15 sent on behalf of the Astor Brothers & Company,
16 correct?
17   A.   Correct.
18   Q.   So that -- how did you know that number
19 just off the top of your head?
20   A.   Because I went through all of them and,
21 yeah, and I counted how many different letters were
22 sent.
23   Q.   Okay.  And you did that before this
24 deposition?
25   A.   Yes, sir.

1    Q.   Okay.  And earlier on in the deposition
2 you mentioned something about 160 big batch accounts
3 from Astor Brothers & Company.  Is that a different
4 batch that we are talking about now?
5    A.   So during the break I found that I was
6 mistaken.  We have had four different batches come
7 through for Astor Brothers, the largest one being the
8 160.
9    Q.   Okay.  When did the batch that
10 Mr. Rodriguez was included in come through?
11   A.   Let's see.  Could I refer to my
12 documentation?
13   Q.   Sure.  Just tell me what you are referring
14 to, I guess.
15   A.   Okay.  Yes, sorry.  Let me see.  So I'm
16 referring to the defendant's Responses to the
17 Interrogatories, Request for Admissions.
18        Okay.  Per our response to Interrogatory
19 Number 2, let's see, we received a spreadsheet on the
20 23rd of April, 2019.
21   Q.   Okay.  I see that.  Where -- I'm sorry,
22 when did Cascade receive the other three portfolios?
23   A.   Let me take a look.  I don't know off the
24 top of my head.  But again, I could find that out.
25   Q.   And just so I'm clear, the portfolio that

12 (Pages 42 - 45)

1 Mr. Rodriguez was included in, that's the 188 -- the
2 one where Astor Brothers & Company provided 188
3 accounts?
4    A.  No.  Sorry.  I might have explained it
5 poorly.  So cumulatively with the four batches there
6 have been 188 letters sent out.  The largest single
7 batch was 160, although I'm not sure if that's the one
8 that contained Mr. Rodriguez's account.
9    Q.  Okay.  Okay.  So the three other batches
10 that we don't know when they were sent to Cascade,
11 those were comprised of about 28 accounts, total?
12    A.  Right.
13    Q.  Okay.  Understood.  And were all of these
14 188 accounts sent letters by Cascade?
15    A.  Sorry.  Can you repeat the question?
16    Q.  Sure.  Were all of the 188 accounts from
17 Astor Brothers & Company sent letters by Cascade?
18    A.  I believe so.
19    Q.  And were any of those letters sent before
20 February 21, 2019?
21    A.  No.
22    Q.  And looking at Exhibit 4, which is the
23 letter that was sent to Mr. Rodriguez, besides the
24 contact information and the amount owed, is there
25 anything different in that letter than the rest of the

1 the exhibit, so I'm not positive.
2    Q.  Sure.  And I guess what I'm trying to get
3 at here is I think that there's more letters here than
4 the 188 letters.  Do you think -- is that accurate?
5    A.  Yes.  But as stated, this exhibit -- oh,
6 this exhibit also includes, in addition to letters, it
7 also includes account import procedures and stuff like
8 that.  Let me see.
9    MR. RASMUSSEN:  Ryan, I don't want to be
10 difficult, but maybe you can specify.  You already said
11 earlier there's multiple documents so you can maybe
12 specify more clearly on your questions.
13    Q.  Yeah.  I mean, I'm generally referring to
14 this exhibit because what I'm trying to determine is
15 whether all 188 letters that Cascade sent on behalf of
16 Astor Brothers & Company are included in this exhibit.
17 That's what I'm trying to get at.
18    A.  To the best of my knowledge, yes.
19    Q.  Okay.  And do you happen to have it pulled
20 up yet?
21    A.  Yes.  It's pulled up.
22    MR. RASMUSSEN:  Yeah, it's up now.
23    Q.  Okay.  I just, just so I understand, the
24 parts that are redacted I'm assuming are the contact
25 information for each of these consumers that were sent

1 188 accounts that Cascade collected on behalf of Astor
2 Brothers & Company?
3    A.  No.  No differences.
4    Q.  And prior to February 21, 2019, was
5 Mr. Rodriguez's account treated any differently than
6 the other accounts that Cascade received from Astor
7 Brothers & Company?
8    A.  No.
9    Q.  Going -- let's go back to Exhibit 6,
10 please.
11    A.  It's loading.
12    Q.  Sure.  No problem.  Just tell me when
13 you're there.
14    MR. RASMUSSEN:  For some reason, it's not
15 loading, Brian.
16    MR. MCBRIDE:  Okay.  Well, maybe we can
17 just --
18    MR. RASMUSSEN:  I'll keep trying.  This is
19 the big one though, right?
20    MR. MCBRIDE:  Yeah, this is the big one.
21 I can -- let me ask him a question and we'll see if we
22 can do it without looking at it.
23    Q.  (By Mr. McBride)  Do you know how many
24 letters were produced in this particular exhibit?
25    A.  No.  Not exactly.  I didn't put together

1 a collection letter; is that correct?
2    A.  That's correct.
3    Q.  Okay.  So Cascade has unredacted versions
4 of these letters in their file system; is that correct?
5    A.  That is correct.
6    Q.  And you're able to create a list of these
7 consumers that were sent collection letters on behalf
8 of Astor Brothers & Company, correct?
9    A.  That is correct.
10    Q.  How long would that take you?
11    A.  Maybe an hour or two.
12    Q.  And you could limit that search to a
13 particular time period?
14    A.  Conceivably, yes.
15    Q.  Okay.  What I'd like to do is take a
16 three- to five-minute break here.  I think I am close
17 to finishing, but I just want to check my notes and
18 make sure I didn't miss anything.
19    MR. RASMUSSEN:  Okay.
20    (Break taken from 3:29 to 3:35 p.m.)
21    Q.  (By Mr. McBride)  Mr. Morris, let's turn
22 to Exhibit 7, please.  And once you're there, let's go
23 to page 8, interrogatory Number 9.  And let me know
24 when you're there.
25    MR. RASMUSSEN:  For some reason it's slow

13 (Pages 46 - 49)

1 again. I don't know why. This isn't a big file.
2          MR. MCBRIDE: No problem.
3     A.   I have a hard copy I can refer to.
4     Q.   (By Mr. McBride) That's fine with me.
5     A.   All right. Which interrogatory was it
6 again?
7     Q.   We are looking at actually 8 and 9.
8     A.   Okay.
9     Q.   Pages 7 and 8.
10    A.   Okay.
11    Q.   These two interrogatories differentiated
12 between letters sent to residents of Utah and those not
13 in Utah. I just wanted to confirm that Interrogatory
14 Number 9, defendant says that there were 252 persons
15 sent a letter with addresses in Utah with the language
16 that was referred to in the complaint; is that correct?
17    A.   That is correct.
18    Q.   Okay. And so I don't want to assume, so
19 I'm just going to ask you, the other 10 were sent to
20 residents outside of Utah, correct?
21    A.   That's correct.
22    Q.   Okay. I just wanted to clarify that. And
23 then let's go down to page -- give me one second.
24 Okay. Yeah, page 11, interrogatory Number 15.
25    A.   Okay.

Page 50

1     Q.   If you go down near the bottom of the
2 page, I just want to flesh this out. It looks like the
3 last, one of the last sentences it says, "If a
4 violation of the FDCPA occurred, Defendant through its
5 then office manager Diana Tartaglia, erred in
6 generating and sending a letter based upon a template
7 that contained language that allegedly violated the
8 FDCPA," and it goes on.
9          So I just want to make sure that, you
10 know, before, we had talked about the bona fide error
11 defense, and I just wanted to make sure that defendant
12 isn't actually pointing to Diana Tartaglia as the
13 reason for the error. Am I right there, or is this
14 response to the interrogatory correct?
15         MR. RASMUSSEN: I'm going to object.
16 That's kind of vague.
17    Q.   Sure. I'll maybe make it --
18         MR. RASMUSSEN: Convoluted I guess I'll
19 just say.
20    Q.   Sure. If you can answer. If not, I can
21 rephrase and make it shorter and make it easier.
22    A.   Yeah, if you could rephrase it, I think.
23    Q.   Sure. So if an alleged error happened, is
24 Diana Tartaglia responsible for that error?
25    A.   Well, this section of the interrogatory is

Page 51

1 an explanation of the alleged error, and not, as you
2 said, to point fingers at anybody in this action. Does
3 that answer your question?
4     Q.   Okay, does that -- well, let's flesh it
5 out a little further. We'll go to section (b) of the
6 same interrogatory and the responses.
7          MR. RASMUSSEN: Which interrogatory is
8 this, Ryan?
9          MR. MCBRIDE: It's still Interrogatory
10 Number 15.
11         MR. RASMUSSEN: Okay.
12    Q.   (By Mr. McBride) The next page, (b), it
13 says, "Defendant again disputes that a violation of the
14 FDCPA occurred, but states that Diana Tartaglia made
15 the error." So my question is did Diana Tartaglia make
16 an error?
17         MR. RASMUSSEN: Objection. Argumentative.
18    A.   Because Diana was the manager at the time,
19 she would have been the one who generated the letter
20 from the template. Let me see. So in that regard, I
21 would say yes.
22    Q.   So you're saying that because she was
23 responsible for sending out the letters, any language
24 incorrect in the letters was her fault?
25    A.   No. As I said before, the template would

Page 52

1 not have been Diana's to edit. It would have been
2 Mr. Rasmussen's. But I guess had the letter not been
3 sent out, there wouldn't have been an error.
4     Q.   Okay. So Cascade's position is that
5 Ms. Tartaglia is the reason for the error because she
6 mailed out the letter, even though she doesn't draft
7 the language in the letter?
8     A.   I think the answer is a little bit
9 nebulous because had the language not been -- sorry.
10 Had the language been put there by Mr. Rasmussen, but
11 not sent out by Ms. Tartaglia, then this -- it wouldn't
12 be an error because it was never sent out. And if
13 Ms. Tartaglia had sent it out but the language hadn't
14 been there, there wouldn't be any language there. So I
15 guess --
16    Q.   Okay.
17    A.   Yeah.
18    Q.   So I guess we previously discussed, you
19 know, what policies that Cascade had in place to avoid
20 the error. Now, the error complained of in the
21 complaint is the language, not the actual sending of
22 the letter. So in regards to the actual language of
23 the letter, does Ms. Tartaglia have any fault there?
24         MR. RASMUSSEN: I'm going to object. It's
25 argumentative and mischaracterizes -- well, yeah,

Page 53

1 that's just argumentative.
2    Q.   Do you need the question repeated?
3    A.   Yes, please.
4       MR. MCBRIDE:  Diana, can you please repeat
5 the question?
6       (The record was read as follows:
7       Question: "So I guess we previously
8       discussed, you know, what policies that Cascade
9       had in place to avoid the error.  Now, the error
10      complained of in the complaint is the language,
11      not the actual sending of the letter.  So in
12      regards to the actual language of the letter,
13      does Ms. Tartaglia have any fault there?")
14      MR. RASMUSSEN:  And I'm going to object.
15 It mischaracterizes the evidence and/or assumes facts
16 not in evidence.
17   A.   As previously stated, Ms. Tartaglia, as
18 part of the procedure, did review the changes made to
19 the language in the collections letter.
20   Q.   Okay.  So you are saying that she is at
21 fault due to her failure to correct the language in the
22 collection letter?
23      MR. RASMUSSEN:  Objection, mischaracterizes
24 Mr. Tucker's testimony.
25      Could I get the question again, please.

1       MR. MCBRIDE:  Diana, could you reread the
2 question please.
3       (The record was read as follows:
4       Question: "So you are saying that she is
5       at fault due to her failure to correct the
6       language in the collection letter?")
7       MR. RASMUSSEN:  And I'm also going to
8 object as argumentative.
9    A.   Sorry.  Since Ms. Tartaglia is the one who
10 did generate the letter and who did review the letter
11 before sending it out and sent it anyway, yes, I would
12 say that she is the one who made the error.
13   Q.   Okay.  That is all that I have.
14 Mr. Rasmussen, do you have any questions?
15      MR. RASMUSSEN:  Yeah.
16
17            EXAMINATION
18 BY MR. RASMUSSEN:
19   Q.   Previously we discussed the error and,
20 Tucker, you refer to it as "the alleged error."  I just
21 wanted to ask about whether or not you were referring
22 to the alleged error or an alleged violation.
23   A.   I was referring to an alleged violation.
24   Q.   And how does the error relate to that
25 violation?

1    A.   The --
2    Q.   Let me rephrase that.  If there wasn't a
3 violation, does it matter if there was an error?
4       MR. MCBRIDE:  Objection.  Vague.
5    Q.   Sorry.  Let me rephrase that.
6       If there was no violation of the FDCPA,
7 does it matter whether or not there was an error as it
8 relates to the affirmative defense in the complaint?
9       MR. MCBRIDE:  Objection.  Calls for a
10 legal conclusion.
11   Q.   You can still answer.
12   A.   I believe there is not a violation.  The
13 error doesn't matter as it could be, as I said before,
14 a matter of semantics or a matter of clerical error.
15   Q.   So let me just ask that question again,
16 because I just want to make it clear or make sure we
17 can understand what you meant and what you were
18 referring to when you said "alleged error," because in
19 our -- in the Seventh Defense it states, this is
20 Exhibit 5, Seventh Defense, it says, "Defendant
21 affirmatively avers and asserts as a defense that any
22 violation complained of and caused by defendant was not
23 intentional and resulted from a bona fide error,
24 notwithstanding the maintenance of procedures
25 reasonably adapted to avoid such error."  Is that

1 correct?
2    A.   Yes.
3    Q.   So my question is if there is no
4 violation, does it matter whether or not there was an
5 error?
6    A.   Not in a legal sense, no.
7    Q.   So if there was a violation, would you say
8 it matters whether or not there was an error, as it
9 relates to --
10      MR. MCBRIDE:  Objection.  Calls for a
11 legal conclusion --
12      REPORTER:  I'm sorry, what was the
13 objection?
14      MR. MCBRIDE:  Sorry.  I'll wait until he
15 finishes his question.
16   Q.   (By Mr. Rasmussen)  In the context of the
17 affirmative defense, if there was a violation, would it
18 matter whether or not you felt like there was an error?
19   A.   I believe so, yes.
20      MR. MCBRIDE:  Same objection.  Legal
21 conclusion.
22   Q.   And so is that why you referred to an
23 alleged error?
24   A.   I believe I just got my terminology mixed
25 up between "violation" and "error."

1  Q. Okay. So is it safe to say, then, you
2  meant "alleged violation" because you feel like no
3  violation exists?
4  A. Yes.
5  Q. Okay. And that if a violation does indeed
6  exist, you are asserting the Seventh Defense?
7  A. That is correct.
8  Q. Okay. One other question. There was some
9  questioning as it relates to who checks the updated
10 templates. I believe you said I do. But your previous
11 testimony was that Cascade Collections would check or
12 review the templates. So if -- prior to when you were
13 working, who would have that been?
14 A. Sorry, yes. Right. My meaning was I, as
15 a manager, do it. Prior to me reviewing those, it was
16 Diana Tartaglia who reviewed them.
17      MR. RASMUSSEN: That's it for me, Ryan.
18
19          FURTHER EXAMINATION
20 BY MR. MCBRIDE:
21 Q. Just a quick follow-up. When, Mr. Morris,
22 just to clarify some of the testimony you made right
23 there, when you referred to an error in our previous
24 testimony today, you actually meant a violation?
25 A. I'm sorry. Can you repeat the question?

Page 58

---

1  Q. Sure. When you referred to an error or an
2  alleged error, you were actually referring to a
3  violation or an alleged violation of the FDCPA; is that
4  correct?
5  A. That is correct.
6  Q. Okay. Nothing further.
7      MR. RASMUSSEN: I'm going to kind of
8  object there as to ambiguous or vague. We talked a lot
9  about the word "error." Are you asking if every single
10 time he used the word "error" he meant "violation"?
11     MR. MCBRIDE: Correct.
12     MR. RASMUSSEN: Okay. Well, I'm going
13 to -- can I ask a follow-up question then, if you're
14 done, Ryan?
15     MR. MCBRIDE: Yeah, I'm done.
16
17          FURTHER EXAMINATION
18 BY MR. RASMUSSEN:
19 Q. I guess, Tucker, in light of what
20 Mr. McBride just said, is your answer still the same if
21 his question is every single time you used the word
22 "error" you meant "violation"?
23 A. No. Not every time I used the word
24 "error" did I mean "violation," specifically earlier in
25 the deposition where I made reference to an alleged

Page 59

---

1  error in the FDCPA when we were discussing the bona
2  fide error. In those instances I meant to refer to
3  violations or alleged violations.
4  Q. And how does the Seventh Defense --
5  A. Oh, yes.
6  Q. And then here's a follow-up question: In
7  that context, we were discussing the Seventh Defense;
8  is that correct?
9  A. That's correct.
10 Q. Okay.
11     MR. MCBRIDE: Do you have more questions?
12     MR. RASMUSSEN: That's it for now.
13     MR. MCBRIDE: So based on that testimony,
14 I probably need to go back through a couple more
15 questions, then, to make sure we are on the same page
16 here.
17
18          FURTHER EXAMINATION
19 BY MR. MCBRIDE:
20 Q. So I'll try to make this as quick and
21 general as possible, but I need to make sure that I
22 understand your earlier testimony, based on what you
23 just said.
24 A. Okay.
25 Q. So when we talked about policies being in

Page 60

---

1  place regarding avoiding an error, were you talking
2  about avoiding an error or an alleged violation of the
3  FDCPA?
4  A. Sorry. One more time?
5  Q. Sure. We talked about policies that
6  Cascade had in place to avoid an error. Now, that
7  whole line of questioning regarding, you know, what
8  Cascade did in order to avoid having language that
9  didn't comply with the FDCPA, were you referring to an
10 error or a violation?
11 A. I was referring to preventing errors in
12 those cases.
13 Q. Okay. And same question for when I asked
14 you about the procedures that Cascade had in place in
15 order to follow those policies.
16 A. Sorry. Can you be more specific, please?
17 Q. Sure. Were you referring to procedures
18 that would help avoid the error, or would help avoid a
19 violation?
20 A. I'm sorry. Which procedures in particular
21 are you referring to? I'm sorry.
22 Q. Okay. Yeah, we can go specific. So you
23 said that -- and I'm summarizing. You testified that
24 Mr. Rasmussen reviews the collection letters. You said
25 the last time he had reviewed the collection letter in

Page 61

1 question was January 2018, and that was one of the
2 procedures that Cascade had in place in order to avoid
3 was it an error or a violation?
4   A.  I see.  I mean both; to prevent an error
5 that could lead to a violation, or just to prevent a
6 violation outright.
7   Q.  Okay.  And is it Cascade's position that
8 an FDCPA violation did not occur?
9   A.  Yes.
10   Q.  Is it Cascade's position that an error did
11 not occur?
12   A.  Yes.
13   Q.  Okay.  That's all.  That clarifies it.
14 Thank you.  If nothing further --
15       MR. RASMUSSEN:  I have a follow-up
16 question.
17
18           FURTHER EXAMINATION
19 BY MR. RASMUSSEN:
20   Q.  But if a violation occurred, is it
21 Cascade's position that an error occurred?
22   A.  Could you repeat the question?
23   Q.  If a violation of the FDCPA occurred, is
24 it Cascade's position that an error occurred?
25   A.  Yes.

Page 62

1 and Mr. Rasmussen, and Diana.  Thank you.
2       MR. RASMUSSEN:  Thanks, Ryan.  Thanks,
3 Diana.
4       REPORTER:  Chad, can I ask about reading
5 and signing?
6       MR. RASMUSSEN:  Yeah, we'll want to.
7       (The deposition concluded at 4:01 p.m.)

Page 64

1   Q.  Okay.
2       MR. MCBRIDE:  I'm sorry.  I need to follow
3 up on that.  Those two statements didn't match up, to
4 me.
5
6           FURTHER EXAMINATION
7 BY MR. MCBRIDE:
8   Q.  Just to be clear, you're saying that an
9 error occurred only if an FDCPA violation is determined
10 by the court, or by a jury?
11   A.  Yes, that's correct.  I mean, there can
12 be -- if there's no violation, as we were talking about
13 before, if there's no violation then there doesn't have
14 to be an error.  But if there was a violation, there
15 would have to be an error.
16   Q.  Okay.  So your determination or Cascade's
17 determination of whether there's an error or not
18 depends on whether there's an FDCPA violation?
19   A.  Yes, because our position is that there
20 was not an error made.  Or I'm sorry, that there was
21 not a violation.
22   Q.  Okay.  Understood.  That's all I have.
23       Mr. Rasmussen, do you have any more?
24       MR. RASMUSSEN:  I believe that's it.
25   Q.  Okay.  Thank you for your time, Mr. Morris

Page 63

1           REPORTER'S CERTIFICATE
2
   STATE OF UTAH          )
3                         ) ss.
   COUNTY OF SALT LAKE    )
4
5       I, Diana Kent, Registered Professional
   Reporter and Notary Public in and for the State of
6 Utah, do hereby certify:
7       That prior to being examined, the witness,
   Tucker Morris, was by me duly sworn to tell the truth,
8 the whole truth, and nothing but the truth;
9       That said deposition was taken down by me
   in stenotype on May 19, 2020, at the place therein
10 named, and was thereafter transcribed and that a true
   and correct transcription of said testimony is set
11 forth in the preceding pages;
12       I further certify that, in accordance with
   Rule 30(e), a reading copy was sent to Attorney Chad
13 Rasmussen for the witness to read and sign, and the
   original transcript will be delivered to Attorney Ryan
14 McBride for safekeeping.
15       I further certify that I am not kin or
   otherwise associated with any of the parties to said
16 cause of action and that I am not interested in the
   outcome thereof.
17
18       WITNESS MY HAND AND OFFICIAL SEAL this 3rd
   day of June, 2020.
19
20
21
22
23   Diana Kent, RPR, CRR
   Notary Public
24   Residing in Salt Lake County
25

Page 65

17 (Pages 62 - 65)

1 Case: Rodriguez et al v. Cascade Collections
  Case No.: 2:20-CV-00130-JNP
2 Reporter: Diana Kent
  Date taken: May 19, 2020
3
            WITNESS CERTIFICATE
4
        I, TUCKER MORRIS, HEREBY DECLARE:
5       That I am the witness in the foregoing
  transcript; that I have read the transcript and know
6 the contents thereof; that with these corrections I
  have noted this transcript truly and accurately
7 reflects my testimony.
8 PAGE-LINE      CHANGE/CORRECTION        REASON

9  _____   _____   _____
10 _____   _____   _____
11 _____   _____   _____
12 _____   _____   _____
13 _____   _____   _____
14 _____   _____   _____
15 _____   _____   _____
16 _____   _____   _____
17 _____   _____   _____
18
  _____  No corrections were made.
19
        I, TUCKER MORRIS, HEREBY DECLARE UNDER THE
20 PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES
  OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE
21 FOREGOING IS TRUE AND CORRECT.
22

23 _____
            Tucker Morris
24
25 _____
            Date Signed
                                    Page 66

Veritext Legal Solutions
866 299-5127

| & | | |
| --- | --- | --- |

**&** 15:12,22 16:5,9
16:13,16,24 17:13
18:16 20:18 21:25
22:22 25:21,24
43:22 44:15 45:3
46:2,17 47:2,7
48:16 49:8

| 0 | | |
| --- | --- | --- |

**00120** 1:9
**00130** 66:1

| 1 | | |
| --- | --- | --- |

**1** 3:14 7:1
**1-7** 4:7
**10** 50:19
**11** 50:24
**1247** 65:22
**15** 50:24 52:10
**160** 18:25 19:18
45:2,8 46:7
**188** 43:23 44:14
46:1,2,6,14,16
47:1 48:4,15
**19** 1:12 65:9 66:2
**19,138.39** 28:10

| 2 | | |
| --- | --- | --- |

**2** 3:15 20:9 45:19
**20** 3:15
**2015** 10:7,14
**2018** 19:3 34:20
62:1
**2019** 3:17 12:13
27:6,10,18,25
34:17 41:2,17
44:10 45:20 46:20
47:4
**2020** 1:12 41:3,18
65:9,18 66:2
**21** 41:2,2,17,18
46:20 47:4

**22** 9:8
**2230** 2:10
**22nd** 9:3,4
**23** 3:16
**23rd** 45:20
**24** 6:22
**252** 50:14
**26** 3:17,17 27:6,10
27:25 34:17 44:10
**260** 41:8
**262** 41:22 43:21
**2633** 2:4
**26th** 27:17
**28** 40:19,21 46:11
**2:20** 1:9 66:1
**2:58** 37:13

| 3 | | |
| --- | --- | --- |

**3** 3:16 23:21
**30** 1:5 65:12
**38** 3:20
**384-0519** 2:12
**3:04** 37:13
**3:29** 49:20
**3:35** 49:20
**3rd** 65:17

| 4 | | |
| --- | --- | --- |

**4** 3:3,17 26:18
37:15 46:22
**40** 3:21
**400-6808** 2:6
**460** 2:5
**4:01** 64:7

| 5 | | |
| --- | --- | --- |

**5** 3:19 29:13 30:3
56:20
**520-5523** 2:6
**55** 3:4
**56** 3:19
**58** 3:5

**59** 3:6

| 6 | | |
| --- | --- | --- |

**6** 1:5 3:20 30:16
38:10 47:9
**60** 3:7
**62** 3:8
**63** 3:9

| 7 | | |
| --- | --- | --- |

**7** 3:14,21 40:9
49:22 50:9
**747-9529** 2:12
**7e** 2:11

| 8 | | |
| --- | --- | --- |

**8** 49:23 50:7,9
**800** 2:6,6
**801** 2:12,12
**84604** 2:11
**85016** 2:5

| 9 | | |
| --- | --- | --- |

**9** 49:23 50:7,14

| a | | |
| --- | --- | --- |

**able** 21:9 49:6
**abreast** 33:16
**access** 7:2
**account** 3:16
11:11 13:8 16:20
17:2,17 21:3,19
24:1,5,10,16,22,23
24:24 25:20 26:9
26:13 27:4,12
31:1 39:22,23
43:25 46:8 47:5
48:7
**accounts** 3:15 13:6
13:7 14:7 16:24
17:14,17,24 18:25
19:15,18,24 20:12
20:14,20 33:1
43:22 45:2 46:3

46:11,14,16 47:1,6
**accuracy** 21:18
35:7
**accurate** 27:9
40:24 48:4
**accurately** 66:6
**action** 52:2 65:16
**actions** 24:14
26:10
**actual** 18:4 31:24
53:21,22 54:11,12
**adapted** 56:25
**added** 8:12 9:2
**addition** 43:17
48:6
**address** 24:15
**addresses** 23:10
50:15
**admissions** 3:22
40:15 45:17
**affirmative** 56:8
57:17
**affirmatively**
56:21
**agency** 13:14,20
**agree** 28:6,8,9,12
33:20 35:23
**agreed** 8:15
**agreement** 3:15
10:21 11:9 15:13
19:15,17,23,25
20:11
**ahead** 19:13 41:10
**al** 66:1
**alcohol** 6:22
**allegation** 31:19
**alleged** 31:3,6 32:2
32:12 33:11,12,25
34:8 51:23 52:1
55:20,22,22,23
56:18 57:23 58:2

59:2,3,25 60:3
61:2
**allegedly** 16:15
30:24 51:7
**allow** 9:7
**allows** 33:19
**alpina** 2:9
**alpinalegal.com**
2:13
**ambiguous** 15:1
22:9 59:8
**amend** 7:24
**amended** 7:12,20
**america** 66:20
**amount** 23:12
28:13 30:13 46:24
**amounts** 23:9
**answer** 3:19 5:9
5:19 6:13 14:21
15:2 16:2 22:10
22:17 29:19,20,24
31:16 39:8 42:24
42:25 43:8 51:20
52:3 53:8 56:11
59:20
**anybody** 52:2
**anyway** 5:11
55:11
**apart** 25:8,10
**apc** 2:3
**apologize** 28:17
**appears** 20:5
**approximately**
14:2 41:3,18
**april** 3:17 27:6,10
27:17,25 34:16
44:10 45:20
**argue** 15:5
**argumentative**
31:15 52:17 53:25
54:1 55:8

**arizona** 2:5
**arrangements**
13:9 16:21
**asked** 61:13
**asking** 8:17 11:25
42:16 59:9
**asserting** 22:16
58:6
**asserts** 56:21
**assigned** 13:6
15:21 16:12
**assigning** 17:16
**assignment** 3:15
19:15
**assigns** 16:24
17:14
**assisting** 13:8
**associate's** 9:25
10:17,19,23,25
11:3
**associated** 65:15
**assume** 5:20,23
16:13 50:18
**assumes** 54:15
**assuming** 7:23
21:13 48:24
**astor** 15:12,18,22
16:5,8,13,16,24
17:13 18:16 20:15
20:18 21:25 22:22
25:20,24 43:17,22
43:25 44:15 45:3
45:7 46:2,17 47:1
47:6 48:16 49:8
**athletics** 43:20
**attempt** 28:10
**attempts** 28:22
**attorney** 2:4,10
11:22 12:2,2
22:16 32:5,9
33:16 65:12,13

**auto** 14:23 26:4
**automated** 18:9
**avers** 56:21
**avoid** 32:3,12
33:24 53:19 54:9
56:25 61:6,8,18,18
62:2
**avoiding** 61:1,2

**b**

**b** 1:5 3:12 52:5,12
**back** 6:14 14:10
19:13 47:9 60:14
**background** 9:23
**bankruptcy** 24:24
25:1
**based** 16:14 26:3
26:16 27:12 39:22
51:6 60:13,22
**batch** 18:20,24
32:21 33:1 44:1,2
44:4 45:2,4,9 46:7
**batches** 45:6 46:5
46:9
**behalf** 1:5 15:17
25:20 44:15 47:1
48:15 49:7
**belief** 25:6
**believe** 11:12
12:22 19:3 30:16
31:22,22 34:20
39:4,17 41:7
43:19,23 44:1
46:18 56:12 57:19
57:24 58:10 63:24
**believing** 38:3
**best** 5:15 6:21 27:8
40:25 48:18
**better** 22:19
**big** 18:20,24 38:13
44:4 45:2 47:19
47:20 50:1

**bit** 4:20 8:11 9:22
11:19 22:11 53:8
**bona** 30:21 51:10
56:23 60:1
**bottom** 51:1
**break** 5:8,10,11
37:9,9,11,13 45:5
49:16,20
**breaks** 5:12
**brian** 47:15
**bring** 22:15
**broad** 6:13
**broadly** 13:5
**brothers** 15:12,18
15:22 16:5,9,13,16
16:24 17:13 18:16
20:15,18 21:25
22:22 25:21,24
43:17,22,25 44:15
45:3,7 46:2,17
47:2,7 48:16 49:8
**business** 13:11,21
14:4,13 28:4
42:13,15
**buy** 15:22 16:5

**c**

**c** 2:1 4:1,15
**call** 16:16,19
**called** 4:4
**calls** 14:19 16:8
56:9 57:10
**car** 25:25
**care** 21:23 34:11
**cascade** 1:5,9 3:18
3:19,23 7:21 9:13
9:19,20 12:6,7,12
13:1,13,15,19,23
14:3,12 15:12,15
15:20,21 16:5,8,16
16:25 17:14,22
18:1 19:1 20:22

20:25 21:11,20
22:21,23 26:10
27:24 28:7,12
29:18 31:21 32:3
32:11 33:24 35:5
35:12,16 36:1,2,11
36:11,14,19 37:4
37:19 45:22 46:10
46:14,17 47:1,6
48:15 49:3 53:19
54:8 58:11 61:6,8
61:14 62:2 66:1
**cascade's** 3:19
13:11 28:4 29:20
29:24 31:6,12
53:4 62:7,10,21,24
63:16
**case** 1:8 6:10
11:10,21 15:18
19:7 29:21,25
30:11 66:1,1
**cases** 61:12
**cause** 65:16
**caused** 56:22
**certain** 38:23
39:17,19
**certificate** 65:1
66:3
**certifications** 11:2
**certify** 65:6,12,15
**chad** 2:9,13 12:8
24:23 34:10 43:10
64:4 65:12
**chance** 6:3 9:9
**change** 6:8,14 8:11
8:24,25 9:1,22
24:22 66:8
**changed** 8:12
**changes** 6:3,5
33:16,18,20,21
35:23 36:17,17,21

54:18
**changing** 7:25
34:6
**check** 18:7 27:5
32:14 33:8 34:20
49:17 58:11
**checking** 33:3
34:2
**checks** 32:17 58:9
**circling** 36:25
**clarifies** 62:13
**clarify** 16:10
22:18 29:24 35:8
39:14 50:22 58:22
**clarifying** 25:3
**classes** 10:16
**clear** 10:15 12:4
19:10 20:5 22:13
45:25 56:16 63:8
**clearly** 48:12
**clerical** 56:14
**client** 12:2 22:16
42:24
**clients** 13:6 14:6
**close** 37:3 49:16
**collect** 13:21,24
15:17,21 17:3,24
18:17 28:10,22
29:2,3
**collected** 47:1
**collecting** 30:12
**collection** 3:15,20
13:20 16:25 17:14
19:15,17,23,25
20:11 21:5 22:6
23:1,3 25:19 27:9
33:2 34:17 35:7
35:13 36:3,9,15,20
37:4 38:20,22
39:15 49:1,7
54:22 55:6 61:24

61:25
**collection's** 29:18
**collections** 1:5,9
3:18,23 7:21 9:20
11:9 12:6,7 13:7
13:14 15:13 24:19
26:10,25 30:25
54:19 58:11 66:1
**collects** 14:3,12
**come** 18:19 20:14
34:24 45:6,10
**comment** 6:6
**commercial** 14:15
15:6
**commit** 31:7,8,11
**committed** 31:13
31:13,20
**communication**
28:7,8
**communications**
12:1
**company** 6:12
12:18 15:12,22
16:6,13,16,24
17:13 18:16 20:18
21:25 22:22 25:21
25:24 29:4 42:15
43:22 44:15 45:3
46:2,17 47:2,7
48:16 49:8
**company's** 16:9
**complained** 40:7
53:20 54:10 56:22
**complaint** 29:21
29:25 31:20,25
34:8 37:18 40:7
41:5,20 50:16
53:21 54:10 56:8
**compliance** 36:23
37:5

**compliant** 32:16
34:12
**complied** 38:3
**complies** 36:20
**comply** 35:18,21
36:4 61:9
**comprised** 46:11
**computer** 18:6
21:14,17
**conceivably** 49:14
**concluded** 64:7
**conclusion** 56:10
57:11,21
**confidential** 42:7
42:9,11,16,21
**confirm** 26:17
50:13
**conform** 32:8
**confused** 36:6
**confusing** 35:11
**consecutive** 25:13
**consider** 14:16,23
**consumer** 14:2,8
14:12,14,17,24
15:6,9 26:4,6
**consumers** 18:23
48:25 49:7
**contact** 13:7 16:20
23:11 31:3 33:4
34:6 46:24 48:24
**contain** 40:6
**contained** 46:8
51:7
**contents** 66:6
**context** 6:10 57:16
60:7
**continue** 8:6
**contract** 11:8
**contracted** 15:16
**contractors** 15:14

Veritext Legal Solutions
866 299-5127

| | | | |
|---|---|---|---|
| **convenience** 28:15 | **creditors** 17:23 | **defendant's** 3:21 | **different** 23:9,9,10 |
| **conversation** 26:4 | 38:25 39:16,20,25 | 45:16 | 23:12 25:12,12 |
| **convoluted** 51:18 | 41:25 42:2,3 | **defense** 30:6,10,15 | 39:16,20,25,25 |
| **copy** 27:9 50:3 | 43:12 | 30:21 51:11 56:8 | 41:25 42:1 44:21 |
| 65:12 | **crr** 1:16 65:23 | 56:19,20,21 57:17 | 45:3,6 46:25 |
| **correct** 9:5,14 | **cumulatively** 46:5 | 58:6 60:4,7 | **differentiated** |
| 15:9,23 19:7 | **current** 12:3,9 | **define** 6:8 | 50:11 |
| 20:18,19 23:20 | 35:3,24 36:2 | **defining** 31:4 | **differently** 22:5,24 |
| 25:5,21,22 26:7 | **customers** 16:9,11 | **degree** 9:25 10:1 | 23:3 47:5 |
| 27:6 28:4,5,18 | **cutting** 43:18 | 10:17,19,23,25 | **difficult** 39:6 |
| 29:5,25 32:10 | **cv** 1:9 66:1 | 11:3 | 48:10 |
| 33:11 34:8 35:19 | | **degrees** 10:25 | **diploma** 10:22 |
| 37:6 44:16,17 | **d** | **delivered** 65:13 | **direct** 37:6 |
| 49:1,2,4,5,8,9 | **d** 3:1 4:1 | **depends** 15:4,5 | **direction** 25:17 |
| 50:16,17,20,21 | **damages** 30:13 | 63:18 | 36:13 |
| 51:14 54:21 55:5 | **date** 6:7 8:23 | **deposition** 1:5,13 | **discovery** 8:16 |
| 57:1 58:7 59:4,5 | 27:24 35:4 66:2 | 3:14 4:17 5:25 | 16:14 19:6 40:24 |
| 59:11 60:8,9 | 66:25 | 7:13,20 11:6,7 | 42:8 |
| 63:11 65:10 66:21 | **dated** 27:6,10 | 24:3 40:2 43:6 | **discussed** 11:21 |
| **correction** 66:8 | **dates** 25:12 39:7 | 44:24 45:1 59:25 | 53:18 54:8 55:19 |
| **corrections** 66:6 | **day** 65:18 | 64:7 65:9 | **discussing** 60:1,7 |
| 66:18 | **days** 25:13 | **describe** 13:3,11 | **discussion** 7:11 |
| **correctly** 18:10 | **dean** 43:18 | 15:11 16:23 17:12 | **dismissed** 25:1 |
| **counsel** 22:14 | **debt** 13:19 14:2,4 | **description** 3:13 | **dispute** 31:2 |
| **counted** 44:21 | 14:7,12,13,14,15 | **designated** 9:13 | **disputes** 38:1 |
| **county** 65:3,24 | 14:17,24 15:9,21 | **details** 42:16 | 52:13 |
| **couple** 12:16,21 | 15:22 16:5,15,15 | **determination** | **district** 1:2,3 |
| 14:6 25:2 60:14 | 16:22 25:23 26:4 | 63:16,17 | **document** 7:15 |
| **court** 1:2 6:2 | 26:7 28:22 30:11 | **determine** 48:14 | 8:10 20:8 23:25 |
| 63:10 | 31:2,2 33:4 38:1 | **determined** 63:9 | 24:18 26:22 27:13 |
| **cover** 39:2 | **debtor** 21:3,19 | **diana** 1:16 6:2 | 27:17,20 28:3 |
| **create** 29:6 49:6 | 24:16,24 31:1 | 12:24,25 17:9,15 | 29:17 30:2,4 33:6 |
| **created** 21:13,13 | **debtor's** 28:25 | 24:14 25:16 27:21 | 33:9 38:18 40:13 |
| 21:16 27:13,20 | **debtors** 13:8 16:21 | 41:14 51:5,12,24 | **documentation** |
| 29:9 | **debts** 13:21,24 | 52:14,15,18 54:4 | 45:12 |
| **creates** 29:4 | 14:8 15:17 | 55:1 58:16 64:1,3 | **documented** 25:16 |
| **creating** 28:3 | **declare** 66:4,19 | 65:5,23 66:2 | **documents** 3:23 |
| **creation** 11:12 | **defendant** 1:10 | **diana's** 53:1 | 11:5 21:9 33:21 |
| **creditor** 11:10 | 2:8 3:23 7:20 | **difference** 5:17 | 34:15 38:19 40:2 |
| 39:24 41:24 | 50:14 51:4,11 | **differences** 47:3 | 40:16 48:11 |
| | 52:13 56:20,22 | | |

Veritext Legal Solutions
866 299-5127

**doing** 4:22 5:2 7:9
  23:19
**double** 34:20
**download** 21:9
**draft** 53:6
**drink** 6:22
**drugs** 6:22
**drywall** 43:18
**due** 23:12 28:13
  54:21 55:5
**duly** 4:4 65:7
**dunning** 21:2,5
  24:19 25:9
**duties** 13:3

**e**

**e** 2:1,1 3:1,12 4:1,1
  4:15 65:12
**earlier** 34:23 45:1
  48:11 59:24 60:22
**earliest** 28:15
**early** 19:3
**easier** 51:21
**east** 2:4
**edge** 43:18
**edit** 53:1
**editing** 34:1,4,5
**education** 9:24
  10:9
**either** 19:13
**employed** 32:12
**employees** 13:15
**employer** 12:3
**entitled** 5:15 42:8
**entries** 25:4
**envelope** 24:15
  25:5
**erred** 51:5
**error** 6:4 24:17
  25:5,14 30:21,22
  30:24 31:3,7,12,13
  31:13,20 32:2,4,12

33:11,25 51:10,13
  51:23,24 52:1,15
  52:16 53:3,5,12,20
  53:20 54:9,9
  55:12,19,20,22,24
  56:3,7,13,14,18,23
  56:25 57:5,8,18,23
  57:25 58:23 59:1
  59:2,9,10,22,24
  60:1,2 61:1,2,6,10
  61:18 62:3,4,10,21
  62:24 63:9,14,15
  63:17,20
**errors** 61:11
**especially** 4:21
**essentially** 30:7
**estimate** 5:15,17
  14:2
**et** 66:1
**evidence** 54:15,16
**exactly** 26:1 47:25
**examination** 3:3,4
  3:5,6,7,8,9 4:9
  55:17 58:19 59:17
  60:18 62:18 63:6
**examined** 4:5 65:7
**example** 6:11 14:6
**excellent** 11:20
**exception** 8:23
  23:8
**exceptions** 23:10
**excluding** 19:5
**exhibit** 3:14,15,16
  3:17,19,20,21 6:25
  7:1 19:9 20:1,8
  23:16,18,21 26:18
  27:3 29:13 37:15
  38:10 40:4,9
  46:22 47:9,24
  48:1,5,6,14,16
  49:22 56:20

**exhibits** 4:7 19:14
**exist** 58:6
**exists** 58:3
**explained** 46:4
**explanation** 52:1

**f**

**fact** 42:14
**facts** 30:9 54:15
**failure** 54:21 55:5
**fair** 15:7
**fairly** 18:18
**far** 4:23 17:16
  25:10 31:12 33:15
**fault** 52:24 53:23
  54:13,21 55:5
**fax** 2:6,12
**fdcpa** 6:12 24:19
  31:9,11 33:12
  38:1 51:4,8 52:14
  56:6 59:3 60:1
  61:3,9 62:8,23
  63:9,18
**february** 41:2,2
  41:17,18 46:20
  47:4
**feel** 58:2
**felt** 57:18
**fide** 30:21 51:10
  56:23 60:2
**figure** 32:25 41:6
  43:23
**file** 38:13 49:4
  50:1
**filed** 24:24
**fill** 17:1,18 20:16
**filled** 17:4
**fills** 20:18
**finally** 24:25
**find** 26:1 44:8
  45:24

**fine** 5:1,12 9:21
  41:11 50:4
**fingers** 52:2
**finish** 5:3,5 30:18
**finishes** 57:15
**finishing** 49:17
**first** 4:4 12:21
  21:1 24:13,16
  29:16 35:2,2 36:5
  37:9
**five** 37:10 49:16
**flesh** 51:2 52:4
**folder** 7:7
**follow** 32:20,23
  58:21 59:13 60:6
  61:15 62:15 63:2
**following** 24:18
  32:2
**follows** 4:5 17:11
  41:16 54:6 55:3
**foregoing** 66:5,21
**forget** 27:23
**forgive** 27:23
**format** 18:8
**formats** 29:11
**formatted** 18:10
**formatting** 18:7
**formulating** 23:1
**forth** 65:11
**found** 35:1 45:5
**foundation** 43:5
**four** 24:13 38:15
  45:6 46:5
**frame** 44:6
**francisco** 1:4 3:16
  3:17 24:6 27:1
  39:12
**frequent** 5:12
**frequently** 18:19
**front** 7:13 26:19
  38:12

Veritext Legal Solutions
866 299-5127

**full** 17:7
**function** 6:25 21:8
**further** 3:5,6,7,8,9
6:6 52:5 58:19
59:6,17 60:18
62:14,18 63:6
65:12,15
**future** 22:15

## g

**g** 4:1
**gears** 9:22
**general** 9:23 11:24
13:11 36:11 37:25
60:21
**generally** 24:15
48:13
**generate** 21:2,9
29:9 55:10
**generated** 24:18
25:8 27:17,22
52:19
**generating** 25:4
51:6
**getting** 23:5 36:24
**give** 4:24 6:20 8:9
23:17 27:14 30:8
30:17 38:9 40:19
50:23
**given** 39:22
**go** 4:19,20 6:14
8:17 11:15,18
18:10 19:13,13
30:3,15 37:4
41:10 47:9 49:22
50:23 51:1 52:5
60:14 61:22
**goes** 18:5,13 33:15
51:8
**going** 4:19 5:19,25
6:24,25 8:17
13:10 14:10,25

19:9 22:14,17
23:16,21 26:18
29:13 30:9 31:14
37:10 38:9 39:9
40:9 42:6 47:9
50:19 51:15 53:24
54:14 55:7 59:7
59:12
**good** 4:23 5:3 37:8
**graduate** 10:5,12
10:22
**graduated** 10:18
**great** 5:7,24 7:4
26:22
**ground** 4:20
**group** 2:3
**guess** 5:16,17
14:10 18:5 21:11
23:8 26:1 32:1
35:3 36:6 39:11
39:14 42:25 43:4
45:14 48:2 51:18
53:2,15,18 54:7
59:19

## h

**h** 3:12
**half** 34:23
**hand** 65:17
**happen** 48:19
**happened** 25:11
25:19 33:11 51:23
**happens** 20:25
**happy** 18:22 22:18
**hard** 14:5,5 50:3
**head** 11:18 18:21
26:2 41:7 43:3,10
43:14 44:7,13,19
45:24
**hear** 43:8
**help** 33:11 40:17
61:18,18

**helpful** 24:11
**helps** 29:9
**high** 10:9,12,17,18
10:20,22
**higher** 10:8
**highest** 9:24
**hold** 7:22 29:22
**hopefully** 37:9
**hour** 5:11 49:11
**hours** 6:22
**huh** 4:25,25

## i

**identify** 42:19
**identity** 42:19,20
**imagewear** 43:19
**import** 11:11 17:6
18:2,5 32:13 48:7
**important** 4:21
**imported** 21:1
**importing** 13:7
**included** 11:14
18:23 19:6 42:3
45:10 46:1 48:16
**includes** 11:11
48:6,7
**including** 20:2
**incorrect** 52:24
**independent** 15:14
**independently**
15:15 36:12,19
**indian** 2:4
**individual** 34:15
**individually** 1:5
**information** 17:2
17:4,5 18:2 20:16
23:1,11 28:25
33:4,4,5,7,10 34:6
34:7,12 42:7
46:24 48:25
**initiated** 17:21

**input** 20:24 28:25
**inputs** 18:13
**inputting** 22:25
**instance** 6:21 23:4
32:20
**instances** 60:2
**instructing** 42:24
**intentional** 56:23
**interested** 65:16
**interrogatories**
3:22 40:15 45:17
50:11
**interrogatory**
45:18 49:23 50:5
50:13,24 51:14,25
52:6,7,9
**introduce** 7:1 19:9
23:16 26:18 29:13
38:9,10 40:9
**introduced** 19:12
23:21
**issue** 8:16
**item** 9:3,4
**items** 9:8

## j

**january** 34:20
62:1
**jnp** 1:9 66:1
**job** 4:23 5:3
**jump** 6:24
**june** 65:18
**jury** 63:10

## k

**k** 4:15
**kazerouni** 2:3
**kazlg.com** 2:7
**keep** 36:22 47:18
**keeps** 33:16
**kent** 1:16 65:5,23
66:2

Veritext Legal Solutions
866 299-5127

**kin** 65:15
**kind** 7:17 10:20
    11:24 13:10 22:8
    23:5,13 29:23
    31:15 37:3 51:16
    59:7
**know** 5:8,16,22
    7:17 8:19 11:16
    11:17 12:1 14:1
    15:2 16:2 17:7
    19:14 23:23 25:23
    25:25 26:2,4,19
    28:16 29:14 30:17
    33:4 36:22 37:15
    38:2,5,7,11,22
    39:1,16,19,21
    40:10 41:3,6,18
    43:2,9,11,13,16
    44:1,7,18 45:23
    46:10 47:23 49:23
    50:1 51:10 53:19
    54:8 61:7 66:5
**knowledge** 27:8
    40:25 48:18
**knowledgeable**
    9:16
**knows** 43:1

**l**

**labeled** 7:17
**lack** 43:5
**lake** 65:3,24
**language** 30:24
    31:4 33:12,17
    34:7,9 37:17,20,22
    37:24,25 38:3
    40:7 41:4,20
    50:15 51:7 52:23
    53:7,9,10,13,14,21
    53:22 54:10,12,19
    54:21 55:6 61:8

**large** 43:25
**largest** 45:7 46:6
**law** 2:3,4,10 32:8
    33:16 34:13 35:15
    35:18,21 36:4,20
    36:23 37:5 38:4
**laws** 66:20,20
**lead** 62:5
**led** 31:24
**left** 12:18
**legal** 2:9 56:10
    57:6,11,20
**letter** 3:17 21:3,5
    21:5 22:7 23:2,3
    24:20 25:9 26:14
    26:17,25 27:2,9
    28:6,9,14,18 30:23
    30:25 36:9,15,20
    37:5,19 39:7,11
    44:11 46:23,25
    49:1 50:15 51:6
    52:19 53:2,6,7,22
    53:23 54:11,12,19
    54:22 55:6,10,10
    61:25
**letters** 3:20 11:10
    11:12 21:23 22:1
    22:20,21 23:8
    25:13 29:10 30:22
    32:14,17 33:2
    34:18 35:1,7,13,18
    36:3 38:20,22
    39:1,10,13,15,23
    40:6 41:3,19
    43:21 44:2,14,21
    46:6,14,17,19
    47:24 48:3,4,6,15
    49:4,7 50:12
    52:23,24 61:24
**level** 9:24

**light** 59:19
**likes** 18:8
**limit** 49:12
**line** 61:7 66:8
**list** 18:17 49:6
**listed** 22:2,21
**little** 4:20 8:11
    9:22 11:19 16:4
    22:11 28:16 35:11
    36:6 39:6 52:5
    53:8
**llc** 1:9 3:23 9:13
    9:20 43:19
**loading** 23:17
    47:11,15
**loan** 14:23 25:25
**location** 1:13
**locations** 13:17
**long** 12:11 49:10
**look** 18:22 24:12
    27:14 30:6 32:15
    35:22 36:17 37:14
    39:3,3,4 45:23
**looked** 27:3
**looking** 7:14 34:11
    46:22 47:22 50:7
**looks** 7:24 24:1,16
    25:7,10,11 32:15
    38:24 39:10 51:2
**lot** 38:18 59:8

**m**

**m** 4:15
**mailed** 21:19 53:6
**mailing** 21:23 23:2
**maintenance**
    43:18 56:24
**making** 13:7,8
    33:3,6 34:12
    36:16
**manager** 12:10,15
    12:17,19,23 13:1,4

    21:22 24:14 35:25
    36:3,11,12 51:5
    52:18 58:15
**managing** 13:5
**marathon** 5:9
**marked** 20:1
**marking** 24:22,23
**match** 63:3
**matches** 33:5
**matter** 56:3,7,13
    56:14,14 57:4,18
**matters** 57:8
**mcbride** 2:3 3:3,5
    3:7,9 4:10 7:9 8:2
    8:5,8,9,25 9:3,5
    17:9,20 20:1,4
    23:20,22 37:14
    38:14,17 39:8
    41:14,23 42:9,12
    42:14,20,23 43:7
    47:16,20,23 49:21
    50:2,4 52:9,12
    54:4 55:1 56:4,9
    57:10,14,20 58:20
    59:11,15,20 60:11
    60:13,19 63:2,7
    65:14
**mean** 13:5,12
    16:10 20:21 21:5
    26:16 32:24 35:9
    35:24 36:16 39:7
    48:13 59:24 62:4
    63:11
**meaning** 58:14
**meant** 56:17 58:2
    58:24 59:10,22
    60:2
**mechanics** 18:4
**medical** 14:7
**memory** 11:19

**mentioned** 18:1
33:3 35:4 45:2
**mgs** 38:15
**middle** 39:23,25
**minus** 9:17
**minute** 8:9 37:10
49:16
**minutes** 25:8
**mischaracterizes**
15:25 53:25 54:15
54:23
**mistake** 25:17
**mistaken** 45:6
**misunderstood**
33:13
**mixed** 57:24
**moment** 8:21
**money** 30:12
**month** 34:22
**morris** 1:7 3:2 4:3
4:15,16 7:2,12
8:10 9:10 18:12
20:7 23:22 26:20
43:7 49:21 58:21
63:25 65:7 66:4
66:19,23
**move** 37:10
**multiple** 48:11

**n**

**n** 2:1 3:1 4:1
**name** 4:11 6:17
12:20 28:24 43:15
**named** 65:10
**nature** 13:11
**near** 51:1
**nebulous** 53:9
**need** 5:8,12 31:2
41:11 54:2 60:14
60:21 63:2
**net** 8:13

**never** 53:12
**normal** 26:16
**north** 2:10
**notary** 1:17 65:5
65:23
**notating** 24:25
**note** 24:25
**noted** 66:6
**notes** 3:16 24:1,5
24:13 25:20 26:9
26:13 27:4,12
49:17
**notice** 3:14 7:13
7:20,24 31:5 43:6
**noticed** 25:17
**notify** 28:21
**notwithstanding**
56:24
**number** 5:13
39:22,23 41:22
44:18 45:19 49:23
50:14,24 52:10

**o**

**o** 4:1,15
**object** 9:7 14:25
22:8 31:14 42:6
43:5 51:15 53:24
54:14 55:8 59:8
**objection** 14:19
15:24 52:17 54:23
56:4,9 57:10,13,20
**objections** 22:14
**obviously** 14:8
23:12
**occur** 62:8,11
**occurred** 30:22
51:4 52:14 62:20
62:21,23,24 63:9
**office** 12:10,14,17
12:18,23 13:1,4
21:22 35:25 36:2

36:10,12 51:5
**official** 65:17
**oh** 17:15 19:8
33:13 43:9 48:5
60:5
**okay** 4:25 5:2,8,13
5:14,23 6:24 7:4
8:2,5,21 9:12,19
9:22 10:15,24
11:20 12:2 13:10
15:7,19 17:20
18:1 19:11,16,21
20:3,13,17,20,24
21:4,7,12,16 22:13
23:7,11,16,25 24:8
24:12 25:2,9,19
26:3,18 28:20,23
29:8,15,16 30:5,15
30:19,20 31:5,10
32:1,15,24 33:8,23
34:16,22 35:5,24
37:8,11,12,17 38:2
38:7,16,21 40:9,13
40:23 41:23 42:23
43:11,15 44:9,14
44:23 45:1,9,15,18
45:21 46:9,9,13
47:16 48:19,23
49:3,15,19 50:8,10
50:18,22,24,25
52:4,11 53:4,16
54:20 55:13 58:1
58:5,8 59:6,12
60:10,24 61:13,22
62:7,13 63:1,16,22
63:25
**once** 8:19 17:3
18:9 19:14 20:24
21:12,16 29:8
40:20 49:22

**ones** 25:8 43:15,20
**opportunity** 6:1,6
**opposed** 4:22,24
14:3 36:6
**opposing** 22:13
**order** 61:8,15 62:2
**original** 7:24 11:9
25:23 39:16 41:24
41:25 42:2,3
65:13
**originate** 37:22
**outcome** 65:16
**outright** 62:6
**outside** 10:25 11:3
50:20
**overdue** 20:22
**owe** 16:15,15
**owed** 30:12 46:24
**owing** 23:10
**owns** 12:7

**p**

**p** 2:1,1 4:1
**p.m.** 1:12 8:1
37:13 49:20 64:7
**page** 3:2,13 21:4
22:18 30:3,16,16
40:19,21 49:23
50:23,24 51:2
52:12 60:15 66:8
**pages** 50:9 65:11
**paragraph** 30:25
37:18
**parkway** 2:10
**part** 28:4 31:1
32:13 33:1 38:22
43:5 54:18
**partially** 20:11
**particular** 16:12
16:15 19:17 34:25
35:5 38:25 42:16
47:24 49:13 61:20

Veritext Legal Solutions
866 299-5127

**parties** 8:14 65:15
**parts** 39:25 48:24
**pay** 16:22 28:13
  30:13
**payment** 13:9
  16:21 28:18
**pdfs** 11:10
**penalties** 66:20
**pending** 5:10
**people** 16:15,17
  18:17 22:2,6,21
  23:4,5,9
**percentage** 14:1,9
**period** 34:25 39:1
  44:2,3,10 49:13
**periodically** 33:18
**periods** 25:10
**perjury** 66:20
**person** 4:23 9:16
  18:12 23:13 33:7
  33:9
**personal** 15:8 26:6
**personally** 38:5
**persons** 50:14
**pertained** 30:24
**phoenix** 2:5
**place** 32:3,19,23
  35:6 53:19 54:9
  61:1,6,14 62:2
  65:9
**plaintiff** 2:2 3:21
  11:8 24:2,6 26:15
  27:1 30:11
**plaintiff's** 7:19
  29:20,24 40:15,24
**plaintiffs** 1:7
**please** 4:11,23
  5:21 6:9 7:18 8:18
  13:3 16:3,11,23
  17:10,12 23:22
  26:19 29:13 31:17

37:15 38:11 40:10
  41:13,15 47:10
  49:22 54:3,4,25
  55:2 61:16
**point** 27:25 36:13
  39:18 52:2
**pointing** 51:12
**policies** 32:3,11
  33:24 53:19 54:8
  60:25 61:5,15
**policy** 32:13,20,23
  33:23
**poorly** 46:5
**popping** 38:11
**portfolio** 16:13
  19:6 22:1 38:23
  38:25 45:25
**portfolios** 45:22
**portion** 39:23
**position** 12:9,18
  12:20,25 31:6,12
  53:4 62:7,10,21,24
  63:19
**positive** 48:1
**possible** 60:21
**potentially** 15:3
**preceding** 65:11
**prelit** 24:19
**premade** 21:10,10
  21:11,12 29:5
**premarked** 4:7
**preparation** 11:6
**preparing** 40:17
**pretty** 8:23 25:10
  34:22
**prevent** 62:4,5
**preventing** 61:11
**previous** 26:3 27:3
  58:10,23
**previously** 53:18
  54:7,17 55:19

**primary** 13:20
**printed** 21:19,20
**printing** 21:23
  23:2
**prior** 12:23 47:4
  58:12,15 65:7
**privilege** 12:2
**privileged** 22:16
**proactively** 37:4
**probably** 14:14
  25:5 60:14
**problem** 27:15
  30:3 47:12 50:2
**procedure** 11:11
  35:12 54:18
**procedures** 32:19
  32:22 35:6 48:7
  56:24 61:14,17,20
  62:2
**process** 16:23
  17:13,21 18:9
  21:7 22:25 23:14
  33:2 38:6
**produced** 47:24
**product** 15:6
**production** 3:23
  40:16
**professional** 65:5
**prompt** 28:18
  36:14
**proofreads** 32:5
**proprietary** 42:10
  42:12
**provide** 17:2
  18:17
**provided** 22:3
  46:2
**provo** 2:11 13:18
**prudence** 35:14
**prudent** 33:18

**public** 1:17 65:5
  65:23
**pulled** 48:19,21
**purchase** 14:16,24
**purchases** 26:5
**purpose** 13:20
  28:17
**put** 7:7 9:6 47:25
  53:10
**puts** 18:13
**putting** 22:24

### q

**question** 5:3,6,10
  5:19,21 6:11,13
  11:12 14:18,22
  16:3 17:7,10,12
  22:9,16,18,19 26:1
  29:23 30:8,9,21
  31:17 33:14 35:8
  35:10 36:18 37:21
  39:7,9 41:13,15,17
  46:15 47:21 52:3
  52:15 54:2,5,7,25
  55:2,4 56:15 57:3
  57:15 58:8,25
  59:13,21 60:6
  61:13 62:1,16,22
**questioning** 58:9
  61:7
**questions** 11:25
  24:9 25:3 48:12
  55:14 60:11,15
**quick** 7:5 58:21
  60:20

### r

**r** 2:1 4:1,15,15,15
**rarely** 18:18
**rasmussen** 2:9 3:4
  3:6,8 7:5,22 8:3,6
  8:22 9:1,4,6 12:8

14:19,25 15:24 19:22 20:3 22:8 23:18 24:23 31:14 32:9 34:10,17 35:6,13,17,17,22 36:5,9,14,21 37:6 37:16,25 38:2,6,8 38:13,15 39:5 41:12 42:6,10,13 42:18,22,25 43:4 47:14,18 48:9,22 49:19,25 51:15,18 52:7,11,17 53:10 53:24 54:14,23 55:7,14,15,18 57:16 58:17 59:7 59:12,18 60:12 61:24 62:15,19 63:23,24 64:1,2,6 65:13

**rasmussen's** 35:14 36:13 53:2

**reach** 17:21,22,23

**read** 17:11 30:7,8 30:17 41:16 54:6 55:3 65:13 66:5

**reading** 30:1 64:4 65:12

**real** 7:5

**really** 42:23

**reason** 6:20 25:4 29:12 47:14 49:25 51:13 53:5 66:8

**reasonably** 56:25

**receipt** 28:13

**receive** 45:22

**received** 10:24 11:2 33:1 45:19 47:6

**recognize** 7:15 23:25 26:22 29:16

38:18 40:13

**record** 4:12 7:11 9:6 17:11 20:5 41:16 54:6 55:3

**redacted** 20:12 48:24

**refer** 9:19 11:13 30:20 41:8,10 45:11 50:3 55:20 60:2

**reference** 24:23 59:25

**referenced** 37:18

**referred** 27:2 41:4 41:20 44:1 50:16 57:22 58:23 59:1

**referring** 19:18 45:13,16 48:13 55:21,23 56:18 59:2 61:9,11,17,21

**reflects** 66:7

**refresh** 7:6 11:18 19:13

**regard** 52:20

**regarding** 8:13 25:4 38:1 39:15 41:25 42:1 43:22 61:1,7

**regards** 21:25 22:24 23:4 31:19 34:4 37:17 53:22 54:12

**registered** 65:5

**regular** 28:3

**relate** 55:24

**relates** 39:24 56:8 57:9 58:9

**relationship** 15:11 42:15,17

**relationships** 42:13

**relied** 38:3

**rely** 35:17 37:19

**remember** 43:20

**repeat** 16:3 17:9 31:17 41:12,14 46:15 54:4 58:25 62:22

**repeated** 54:2

**repetitive** 28:17

**rephrase** 5:21 14:18,22 51:21,22 56:2,5

**reporter** 1:16 6:2 57:12 64:4 65:5 66:2

**reporter's** 65:1

**representative** 9:13

**request** 3:22 34:10 40:15,16 45:17

**requests** 3:22 40:24

**required** 33:17

**reread** 55:1

**reserve** 22:14

**residents** 50:12,20

**residing** 65:24

**respond** 5:4

**response** 4:24 5:5 45:18 51:14

**responses** 3:21 6:5 11:13 16:14 19:5 19:7 40:14,17,23 41:7 42:4 45:16 52:6

**responsible** 51:24 52:23

**rest** 46:25

**resulted** 56:23

**retain** 32:5

**return** 17:4

**review** 6:1 8:10,18 9:9 11:5 17:5 21:2 24:3 25:17 33:19 35:20 36:3,9,12,15 36:19 37:4 54:18 55:10 58:12

**reviewed** 8:19,20 11:17 21:18 34:17 35:1,2 40:2 58:16 61:25

**reviewing** 14:10 36:5 58:15

**reviews** 35:6,13 61:24

**right** 6:24 7:10,14 22:15 23:14,15 29:10 33:6,7,7,8,9 33:10 34:6 46:12 47:19 50:5 51:13 58:14,22

**road** 2:4

**rodriguez** 1:4 3:16 3:18,19 24:6 26:5 26:11,14 27:1,4,10 28:7,10,13 30:23 41:5,21 44:11 45:10 46:1,23 66:1

**rodriguez's** 3:22 31:20,25 40:7 46:8 47:5

**royal** 36:1

**rpr** 1:16 65:23

**rule** 11:24 65:12

**rules** 4:20,21 9:7

**running** 34:13

**ryan** 2:3,7 7:5,22 8:22 19:22 23:19 41:12 48:9 52:8 58:17 59:14 64:2

Veritext Legal Solutions
866 299-5127

65:13

**s**

**s** 2:1 3:12 4:1,15
**safe** 44:9 58:1
**safekeeping** 65:14
**sake** 32:1
**salt** 65:3,24
**saying** 8:22 10:16
  15:7,20 31:6,10
  36:22 52:22 54:20
  55:4 63:8
**says** 24:18 30:7
  50:14 51:3 52:13
  56:20
**school** 2:4 10:9,13
  10:17,18,20,22
**seal** 65:17
**search** 49:12
**sec** 27:14
**second** 8:18,18
  19:9 23:17 25:7
  30:6,9,15,17,25
  37:18 38:10,11
  40:19 50:23
**section** 51:25 52:5
**see** 7:19 11:7
  17:15 18:4 19:2
  19:14,16 23:24
  24:12,15,21 25:7
  26:21 27:16 29:14
  29:15 33:8,13
  34:19,20 36:18,20
  38:24 41:6 42:5
  44:4 45:11,15,19
  45:21 47:21 48:8
  52:20 62:4
**seeking** 8:15
**seen** 8:4 40:1
**semantics** 31:23
  56:14

**send** 14:7 17:19
  21:2 32:14 36:10
**sending** 30:22
  33:2,6 34:13 51:6
  52:23 53:21 54:11
  55:11
**seniors** 10:21
**sense** 6:18 57:6
**sent** 11:10 18:20
  18:21 19:1 20:16
  20:22 22:1,6,20,21
  23:9 25:13 26:14
  26:17 27:1,10
  33:9 39:12 41:4
  41:19 43:21 44:2
  44:5,11,15,22 46:6
  46:10,14,17,19,23
  48:15,25 49:7
  50:12,15,19 53:3
  53:11,12,13 55:11
  65:12
**sentence** 31:23,24
**sentences** 51:3
**series** 3:20
**set** 30:14 65:10
**seventh** 56:19,20
  58:6 60:4,7
**share** 6:25
**shared** 7:23
**shorter** 51:21
**sign** 65:13
**signature** 40:21
  65:22
**signed** 11:8 66:25
**signing** 64:5
**similar** 41:4,19
**similarly** 1:6
**simple** 16:5
**simplicity** 29:2,2,4
  29:7,8,9

**single** 46:6 59:9,21
**sir** 6:23 10:20 11:1
  11:4 13:22,25
  18:15 21:15 27:7
  27:19 29:6 30:1
  31:8 40:22 44:25
**sit** 32:21
**situated** 1:6
**six** 24:13
**slow** 49:25
**smoothly** 4:21
**software** 18:8
  28:24
**solely** 35:17
**sorry** 7:22 8:7
  10:3 12:4 17:6
  18:19 27:17 28:21
  30:1 32:24 33:13
  43:7 45:15,21
  46:4,15 53:9 55:9
  56:5 57:12,14
  58:14,25 61:4,16
  61:20,21 63:2,20
**sounds** 39:9
**span** 39:11
**speak** 14:9
**specific** 32:22
  34:22 37:24 61:16
  61:22
**specifically** 34:9
  38:21 59:24
**specify** 48:10,12
**speculation** 14:20
**speed** 8:11
**spell** 4:11,13
**spelled** 6:16
**spreadsheet** 17:1
  17:5,18 18:2,5,7,9
  19:24 20:12,13,17
  22:2,22 44:6
  45:19

**ss** 65:3
**started** 19:3 27:24
  28:1
**state** 1:17 4:11,13
  65:2,5 66:20
**stated** 48:5 54:17
**statements** 63:3
**states** 1:2 31:1
  52:14 56:19 66:20
**status** 24:22
**stenotype** 65:9
**step** 21:2,17
**stop** 17:8
**stores** 29:7
**stuff** 18:6 23:10
  48:7
**subset** 23:4
**substance** 31:24
**substantive** 6:5,8
  6:16,17
**suite** 2:5,11
**summarizing**
  61:23
**support** 30:10
**supposed** 7:7
**sure** 4:24 6:10 8:8
  11:15,16 12:5,22
  13:5 14:8 15:19
  16:4,12 18:7,20
  19:8,23 20:6
  25:15 31:19 32:6
  32:7,14,15 33:3,6
  33:19 34:12,14
  35:10,18,20,23
  36:4,8,18,24 37:22
  44:12,13 45:13
  46:7,16 47:12
  48:2 49:18 51:9
  51:11,17,20,23
  56:16 59:1 60:15
  60:21 61:5,17

Veritext Legal Solutions
866 299-5127

| | | | |
|---|---|---|---|
| **sworn** 4:4 65:7 | **ten** 23:5 | **today** 5:15,19 6:2 | **u** |
| **system** 17:6 18:3,6 | **terminology** 57:24 | 6:21 9:20 58:24 | |
| 18:10,14 20:25 | **testified** 4:5 16:1 | **top** 11:17 18:21 | **u** 4:15 |
| 21:8 23:1 28:24 | 33:10 36:8 61:23 | 26:2 41:7 43:3,9 | **uh** 4:25,25 |
| 29:1 33:5 49:4 | **testify** 9:12 | 43:13 44:7,13,19 | **understand** 4:25 |

**t**

| | | | |
|---|---|---|---|
| | **testimony** 6:21 | 45:24 | 5:20,20,22,23 6:7 |
| **t** 3:12 4:15 | 15:25 54:24 58:11 | **topic** 8:12 9:14,17 | 23:7 36:18 37:21 |
| **take** 5:10,11 6:21 | 58:22,24 60:13,22 | 43:6 | 48:23 56:17 60:22 |
| 8:18 17:17 24:12 | 65:10 66:7 | **topics** 9:17 37:10 | **understanding** |
| 26:10 27:14 34:11 | **text** 41:9,10 | **total** 14:9 46:11 | 15:20 |
| 37:8,10,14 39:3,4 | **thank** 5:7 17:15 | **trained** 12:25 | **understood** 6:19 |
| 45:23 49:10,15 | 25:2 28:23 62:14 | **training** 12:17 | 10:24 46:13 63:22 |
| **taken** 4:17 24:14 | 63:25 64:1 | **trainings** 11:3 | **united** 1:2 66:20 |
| 37:13 49:20 65:9 | **thanks** 6:19 64:2,2 | **transcribed** 65:10 | **university** 2:10 |
| 66:2 | **thereof** 65:16 66:6 | **transcript** 6:1,4 | 10:2,4,6,10 |
| **takes** 21:23 | **thing** 5:4 37:2 | 65:13 66:5,5,6 | **unredacted** 49:3 |
| **talk** 9:23 | **things** 8:11 | **transcription** | **update** 35:22 |
| **talked** 7:25 22:25 | **think** 6:12 7:23,23 | 65:10 | **updated** 58:9 |
| 43:24 51:10 59:8 | 8:3 9:7 14:5 15:3 | **treated** 47:5 | **updating** 35:15 |
| 60:25 61:5 | 15:25 18:19 22:11 | **true** 27:9 40:24 | **urology** 43:19 |
| **talking** 19:19 34:5 | 23:7 25:3,14 26:5 | 65:10 66:21 | **use** 15:8 26:6 |
| 34:7 45:4 61:1 | 32:7 35:10 36:24 | **truly** 66:6 | 28:25 29:7 35:21 |
| 63:12 | 36:25 37:1,2,8 | **trust** 35:14,16 | **usually** 5:11 |
| **tartaglia** 12:24 | 42:8,20 48:3,4 | **truth** 65:7,8,8 | **utah** 1:3,17 2:11 |
| 25:16 27:21 51:5 | 49:16 51:22 53:8 | **try** 5:4 16:20,21 | 10:2,3,4,5,9 43:19 |
| 51:12,24 52:14,15 | **thinks** 33:18 | 22:18 60:20 | 50:12,13,15,20 |
| 53:5,11,13,23 | **third** 25:8 | **trying** 32:7,24 | 65:2,6 66:20 |
| 54:13,17 55:9 | **thought** 38:6 | 37:1 42:18 47:18 | **uvu** 10:21 |
| 58:16 | **three** 24:16 25:4,8 | 48:2,14,17 | |

**v**

| | | | |
|---|---|---|---|
| **tel** 2:6,12 | 25:12,12,13 45:22 | **tucker** 1:7 3:2 4:3 | |
| **tell** 5:21 7:18 8:10 | 46:9 49:16 | 4:15 55:20 59:19 | **v** 3:19 66:1 |
| 25:11 26:13 27:11 | **time** 8:12,14,16,25 | 65:7 66:4,19,23 | **vague** 15:1 22:9,11 |
| 38:21 45:13 47:12 | 9:1 20:22 25:10 | **tucker's** 15:25 | 39:6 51:16 56:4 |
| 65:7 | 34:16,25 37:8 | 54:24 | 59:8 |
| **template** 35:3 51:6 | 39:1 44:2,3,6,10 | **turn** 49:21 | **valley** 10:2,4,5,9 |
| 52:20,25 | 49:13 52:18 59:10 | **twenty** 9:8 | **variety** 33:21 |
| **templates** 21:10 | 59:21,23 61:4,25 | **two** 24:13 34:23 | **various** 11:10 |
| 21:10,12 29:5,6,9 | 63:25 | 49:11 50:11 63:3 | 29:11 38:25 |
| 29:10 32:6 34:1,4 | **titan** 43:19 | | **vehicle** 14:17 15:5 |
| 36:10 58:10,12 | **title** 12:14 30:2 | | 15:8 26:1,6 |
| | | | **verbal** 4:24 |

| | |
|---|---|
| **verify** 19:4 31:2<br>39:12 44:12 | **work** 5:6 12:5<br>18:3 21:7 26:16 |
| **versions** 49:3 | **worked** 12:11,12 |
| **violate** 6:15 | **working** 27:24,24 |
| **violated** 6:12 51:7 | 58:13 |
| **violates** 33:12 | **worth** 8:13 |
| **violation** 6:15 31:9 | **written** 17:18 |
| 31:11 51:4 52:13 | 20:21 |
| 55:22,23,25 56:3,6 | **wrong** 6:17 |
| 56:12,22 57:4,7,17 | **x** |
| 57:25 58:2,3,5,24 | **x** 3:1,12 |
| 59:3,3,10,22,24 | **y** |
| 61:2,10,19 62:3,5 | **yeah** 5:18 7:14 |
| 62:6,8,20,23 63:9 | 13:8 15:13 17:16 |
| 63:12,13,14,18,21 | 20:4,10 22:11 |
| **violations** 60:3,3 | 25:18 36:1 37:1,2 |
| **virtual** 1:13 | 39:10 41:10,22 |
| **vs** 1:8 | 42:22 44:21 47:20 |
| **w** | 48:13,22 50:24 |
| **w** 43:18 | 51:22 53:17,25 |
| **wait** 5:5 36:14,16 | 55:15 59:15 61:22 |
| 37:5 57:14 | 64:6 |
| **waiting** 5:3 | **year** 10:12,18 28:2 |
| **walk** 24:9 | 34:23 39:11 |
| **want** 5:16 12:1 | **years** 33:22 34:23 |
| 15:19 19:22 39:5 | **z** |
| 48:9 49:17 50:18 | **zoom** 1:13 4:22 |
| 51:2,9 56:16 64:6 | |
| **wanted** 11:16,16 | |
| 28:12 50:13,22 | |
| 51:11 55:21 | |
| **wanting** 19:24,25 | |
| **wants** 31:1 | |
| **week** 7:25 32:22 | |
| **weeks** 12:16,21 | |
| **went** 23:14 44:20 | |
| **witness** 4:4 38:16 | |
| 43:2 65:7,13,17 | |
| 66:3,5 | |
| **word** 31:5 32:7 | |
| 59:9,10,21,23 | |

Veritext Legal Solutions<br>866 299-5127

(E) Submission to Witness; Changes; Signing. Within 28 days after being notified by the officer that the transcript or recording is available, a witness may sign a statement of changes to the form or substance of the transcript or recording and the reasons for the changes. The officer shall append any changes timely made by the witness.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.